# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CONFERENCE OF STATE BANK SUPERVISORS, INC. ) <br> 1129 20th Street, N.W. ) <br> Washington, D.C. 20036 ) <br> ) <br>           Plaintiff, ) <br> ) <br>   v. ) <br> ) <br> OFFICE OF THE COMPTROLLER ) <br> OF THE CURRENCY, ) <br> 400 7th Street SW, ) <br> Washington, D.C. 20219 ) <br> ) <br> and ) <br> ) <br> BRIAN BROOKS, ) <br> ACTING COMPTROLLER OF THE CURRENCY, ) <br> 400 7th Street SW, ) <br> Washington, D.C. 20219 ) <br> ) <br>           Defendants. ) | Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff CONFERENCE OF STATE BANK SUPERVISORS, INC. ("CSBS") brings

this Complaint for declaratory and injunctive relief against the OFFICE OF THE

COMPTROLLER OF THE CURRENCY and BRIAN BROOKS, ACTING COMPTROLLER

OF THE CURRENCY ("Acting Comptroller Brooks") (collectively, the "OCC"), alleging as

follows:

## INTRODUCTION

1.      CSBS, the nationwide organization of state banking and financial regulators in the

United States, brings this action challenging the OCC's creation of a new special-purpose

national bank charter for nonbank companies (a "Nonbank Charter" and the "Nonbank Charter

Program"), and the OCC's solicitation, acceptance and impending approval of an application for a Nonbank Charter from Figure Technologies Inc. (the "Figure Charter Application") which, together with its subsidiaries, is a nonbank financial technology ("fintech") company currently regulated by CSBS's members.

2.     CSBS's members have been successfully licensing and regulating nonbank institutions like Figure Technologies for more than a century. In addition to supervising state-chartered banks, the states regulate a variety of nonbank financial services providers, including money transmitters, mortgage lenders, consumer lenders, and debt collectors.

3.     Since 2018, Figure Technologies' wholly owned subsidiary, Figure Lending LLC (collectively, "Figure"), has been licensed and regulated by state regulators as a mortgage lender, consumer lender, and/or debt collector in 49 states and the District of Columbia. Now, working closely with the OCC and Acting Comptroller Brooks, Figure is on the verge of obtaining a Nonbank Charter that it asserts will permit it to carry on these same activities without any state licensure or regulatory oversight.

4.     For many decades, and long before the OCC's interest in nonbank fintech companies like Figure manifested itself in the Nonbank Charter Program, nonbanks have unquestionably been subject to state regulatory authority and state law—including but not limited to licensing, examination and reporting requirements, usury laws, and a variety of other consumer protections, such as restrictions on product terms and unfair and deceptive practices, and requirements pertaining to disclosure, investments, and net worth. Among other prudential requirements, states also impose upon these nonbank companies certain business-conduct requirements and ensure that these institutions conform to both state and federal consumer-protection and anti-money-laundering laws. State regulators are responsible for enforcing these

Case 1:20-cv-03391-DLF   Document 1   Filed 11/23/20   Page 3 of 30

laws and providing restitution to consumers, as well as receiving and resolving any complaints submitted by consumers regarding the practices of financial institutions operating in their state.

5. The growth of the nonbank financial services industry has drawn the OCC's attention, initially leading to the creation of its Nonbank Charter Program and now culminating in the OCC's solicitation, acceptance and imminent approval of the Figure Charter Application. The primary purpose of the Nonbank Charter Program is to enable nonbank fintech companies, such as Figure, to escape state regulation by preempting and displacing the licensing, regulation, and supervision responsibilities of state authorities over these institutions.

6. By creating the Nonbank Charter and actually soliciting, accepting, and imminently approving an application for a Nonbank Charter in the form of the Figure Charter Application, the OCC has gone far beyond the limited chartering authority granted to it by Congress under the National Bank Act (the "NBA") and other federal banking laws. Those laws cabin the OCC's authority to charter only those institutions that lawfully carry on either the "business of banking" or certain special purposes expressly authorized by Congress.

7. The OCC formally announced its interest in nonbanks and the creation of a new national bank charter for nonbank companies in December 2016, under the leadership of then-Comptroller Thomas J. Curry ("Comptroller Curry"). Over the course of two presidential administrations, four different Comptrollers, and numerous OCC publications related to the Nonbank Charter, a variety of labels have been applied, and different (sometimes contradictory) legal justifications have been advanced to support the Nonbank Charter Program. But at its heart, the Nonbank Charter has always been a new type of special purpose charter improperly created under the NBA without requiring that the charter recipient engage in deposit-taking or that it obtain deposit insurance from the Federal Deposit Insurance Corporation ("FDIC"). Ultimately,

Case 1:50-AX65aA\DFE  Document 1  Filed 7/03/30PLised 3/4 10

3

this unprecedented assertion of OCC chartering authority rests on the untenable assertion that national banks are not required to obtain FDIC insurance to be lawfully entitled to commence the business of banking under the NBA.

8.      In the years since the OCC announced its Nonbank Charter initiative, the OCC consistently has attempted to circumvent the deposit insurance requirement for national banks by arguing that a national bank is required to obtain deposit insurance only if it is engaged in receiving deposits. To support the notion that deposit taking is not required to carry on the business of banking, the OCC has relied upon its own never-used (and recently invalidated) regulation, 12 C.F.R. 5.20(e)(1), which provides, without precedent or statutory basis, that receiving deposits is not necessary to carry on the business of banking.

9.      Throughout the multiple rounds of prior litigation filed by CSBS and the New York Department of Financial Services ("NYDFS") challenging the OCC's authority to grant Nonbank Charters, the OCC responded to arguments that the Federal Reserve Act ("FRA") and Federal Deposit Insurance Act ("FDIA") require national banks to obtain deposit insurance by repeatedly asserting that deposit insurance is required for national banks *only if* the proposed national bank would be eligible for deposit insurance, that is, only if it would, in OCC's view, be "engaged in the business of receiving deposits, other than trust funds" within the meaning of the FDIA.

10.     The OCC was dealt a significant blow in May 2019, when the United States District Court for the Southern District of New York ("SDNY") ruled that the OCC lacked authority to issue Nonbank Charters, in part, because obtaining deposit insurance is required for national banks to lawfully commence the business of banking and, thus, receiving deposits is indispensable to the business of banking under the NBA. *Vullo v. Office of the Comptroller of the*

*Currency*, 378 F. Supp. 3d 271, 296 (S.D.N.Y. 2019) (the "*Vullo* Ruling"). The SDNY entered a final judgment and order setting aside the OCC's chartering regulation with respect to charter applicants that would not accept deposits. *Lacewell v. Office of the Comptroller of the Currency*, 2019 U.S. Dist. LEXIS 182934 (S.D.N.Y. Oct. 21, 2019).

11.      Notably, when seeking to dismiss CSBS's prior lawsuit challenging the Nonbank Charter Program in this Court, the OCC itself explained to this Court that "that the link between being a national bank and having deposit insurance applies only to those national banks that actually hold deposits other than trust funds" and, therefore, only those national banks that take deposits other than trust funds "need to obtain deposit insurance" due to the national bank deposit insurance mandate. *See* Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss for Lack of Jurisdiction and For Failure to State a Claim, filed in *Conference of State Bank Supervisors v. Office of the Comptroller of the Currency*, 1:18-cv-02449 at pp. 41-43 (Doc. 12). The OCC doubled down on this admission when challenging the *Vullo* Ruling in the United States Court of Appeals for the Second Circuit, conceding that the national bank deposit insurance mandate applies to "deposit-taking" national banks.

12.      In an effort to avoid the death blow dealt by the 2019 *Vullo* Ruling, and to salvage its efforts to grant charters to nonbank institutions regulated by CSBS's members, the OCC has solicited, vetted and in November 2020 accepted as complete, Figure's application for a Nonbank Charter.

13.      Once formally approved by the OCC, the institution Figure seeks to organize, Figure Bank, N.A. ("Figure Bank"), will continue its (currently state-regulated) lending and payments activities, free of state regulation and supervision and, based on the language of the application, without obtaining deposit insurance from the FDIC.

14.     Undoubtedly cognizant of the challenges presented by the *Vullo* Ruling's recent invalidation of the Nonbank Charter Program, Figure representatives have insisted in public statements to the press that Figure has not applied for a "Nonbank Charter" because, after extensive consultation with the OCC through the draft application process, the OCC has concluded that Figure Bank will be engaged in receiving deposits, as that term is defined under the FDIA.

15.     Inexplicably, however, the OCC-vetted application states that Figure Bank "will not be an insured depository institution," and thus will not apply for or obtain deposit insurance from the FDIC, despite the OCC's prior repeated concessions that deposit insurance is required for depository institutions.

16.     Regardless of whether, in the OCC's view, Figure Bank will or will not be engaged in receiving deposits, Figure and the OCC have concluded that Figure Bank will be engaged in the banking business but will not be required to become FDIC-insured to commence business—thus, it is clear that Figure has applied for a Nonbank Charter.

17.     The OCC is exceeding its chartering authority by administering the Nonbank Charter Program and by accepting and imminently approving Figure's application for a Nonbank Charter thereunder because, to lawfully commence the business of banking, a national bank must be eligible for, apply for, and obtain deposit insurance from the FDIC.

18.     It is well settled by court precedent, federal banking laws, and historical chartering practice that to lawfully commence the "business of banking" under the NBA, a national bank must, at a minimum, engage in receiving deposits and apply for and obtain federal deposit insurance. Yet the OCC has, through its latest effort, created without statutory authorization a new type of charter for nonbank companies that would neither lawfully carry on

the business of banking (because chartered institutions would not be FDIC-insured), nor any other Congressionally authorized special purpose.

19.     Because creating a special purpose charter for nondepository institutions and soliciting and accepting the Figure Charter Application, and the interpretation upon which the OCC relies in doing so, are contrary to the NBA and violate other federal banking laws, the OCC has acted beyond its statutory authority and not in accordance with law.

20.     Further, because the OCC established the Nonbank Charter Program without adequately considering and addressing the myriad policy implications and concerns raised by the public or conducting an adequate cost-benefit analysis, and because the OCC has not offered a reasoned explanation for its decision, its actions should be deemed not only contrary to law, but also arbitrary, capricious, and an abuse of discretion.

21.     Additionally, in purportedly authorizing a charter for noninsured national banks, the Nonbank Charter Program and the OCC's decision to accept and approve the Figure Charter application are arbitrary and capricious because this action directly contradicts the OCC's repeated prior public assertions (including before this Court) that a national bank that receives deposits must obtain deposit insurance from the FDIC.

22.     Moreover, the OCC's attempt to enable nonbanks regulated by the states to escape state regulation by availing themselves of federal preemption afforded under the NBA, as provided in certain regulations reflecting the OCC's determinations regarding which state laws are preempted (12 CFR §§ 7.4007, 7.4008, and 34.4), is improper because those regulations are invalid.

23.     Specifically, following the 2008 financial crisis, in passing the Dodd-Frank Act, Congress narrowed the scope of federal preemption of state consumer financial laws (and limited

the OCC's authority to preempt such laws), in part, by amending the NBA and establishing certain requirements for the OCC to promulgate preemption regulations. *See* 12 U.S.C. § 25b. Among other things, these amendments limited preemption to those state laws that "prevent or significantly interfere" with the exercise of a national bank's powers, mandated that the OCC evaluate preemption on a case-by-case basis, and required that the OCC revisit and submit its preemption regulations to public comment every five years.

24.     When the OCC revised its preemption regulations in 2011 in response to the NBA amendment, and in the years since Dodd-Frank, the OCC has failed to comply with any of the requirements found in Section 25b. Because the OCC preemption regulations exceed the OCC's statutory authority under Section 25b and have been promulgated without observance of procedure required by law, the OCC's preemption regulations are invalid regardless of whether the OCC has the authority to create the Nonbank Charter. Moreover, this procedural injury claim is irrefutably ripe.

25.     CSBS's challenge to the OCC's chartering authority is also ripe for review. On April 30, 2018, this Court found that the OCC's issuance of a Nonbank Charter was too speculative to support standing or ripeness and dismissed CSBS's prior lawsuit without prejudice. At that time, the OCC was in the midst of a leadership change and had publicly expressed uncertainty regarding whether it would move forward with the Nonbank Charter Program at all. In fact, in seeking the dismissal of CSBS's lawsuit as premature, the OCC argued it was "incontrovertible that the OCC ha[d] not decided whether to accept applications" for the Nonbank Charter Program. *See* Reply in Support of Defendant's Motion to Dismiss, filed in *Conference of State Bank Supervisors v. Office of the Comptroller of the Currency*, 1:17-cv-00763 at p. 14 (Doc. 15). This Court relied on the OCC's statements that, for example, "even if a

Fintech attempted to apply, the OCC may not accept the application" (*Id.*), and ultimately determined that there were not sufficient allegations that the "OCC will issue a charter *imminently*." Memorandum Opinion at p. 5 (Doc. 19) (emphasis added).

26.     After former Comptroller Otting made clear the OCC's intent to accept applications for Nonbank Charters on July 31, 2018, CSBS filed its second lawsuit challenging the Nonbank Charter Program in October 2018. In September 2019, this Court found that CSBS's suit was unripe because no application for a Nonbank Charter had yet been filed. *Conference of State Bank Supervisors v. Office of the Comptroller of the Currency*, No. 18-cv-2449 (DLF), 2019 U.S. Dist. LEXIS 149531 (D.D.C. Sep. 3, 2019).

27.     Things have changed substantially since the Court's most recent decision, however. The OCC has solicited, vetted and accepted the Figure Charter Application—an application for a Nonbank Charter from a company that is licensed and regulated in all but one state and intends, under its charter, to operate in all states free of state regulatory oversight and consumer protection laws. Because of the extensive consultation with Figure that occurred during the draft application process, and the OCC's accepting the application as complete, the OCC's imminent approval of the Figure Charter Application is a foregone conclusion. Additionally, the OCC is actively soliciting other applications for Nonbank Charters and has expressed publicly its enthusiasm for issuing Nonbank Charters.

28.     Both CSBS and each of its members that currently supervise and regulate Figure's operations in their states have already suffered actual injury as a result of the confusion and disruption of resource allocation created by the Nonbank Charter Program and Figure Charter Application, as described herein. Additional injuries to CSBS and its members are imminent as Figure prepares to begin operating as a chartered nonbank and the OCC continues its pursuit of

Case 1:50-cv-03101-DLF Document 1 Filed 13/35/30 Page 8 of 30

9

additional Nonbank Charter applicants. The injuries suffered by CSBS and its members have therefore taken a concrete and particularized form, and the legal challenge brought by CSBS is fit for adjudication.

29.     For all of these reasons, the Nonbank Charter Program and the OCC's imminent granting of a Nonbank Charter to Figure are subject to this Court's review under the Administrative Procedure Act ("APA") and cannot stand. CSBS brings this action seeking declaratory and injunctive relief declaring the OCC's Nonbank Charter Program and the Figure Charter unlawful and enjoining the OCC from soliciting, accepting, or approving applications for Nonbank Charters, including the Figure Charter Application.

30.     Additionally, CSBS seeks a declaration that the OCC's preemption regulations (found at 12 CFR §§ 7.4007, 7.4008, and 34.4) are invalid and enjoining the OCC from further action pursuant to those regulations.

## **PARTIES**

31.     Plaintiff CSBS is the nationwide organization of state banking and financial services regulators from all 50 U.S. states, the District of Columbia, Guam, Puerto Rico, the U.S. Virgin Islands, and American Samoa. CSBS is a 501(c)(3) corporation incorporated and headquartered in Washington, DC.

32.     For more than a century, CSBS has given state bank and financial services regulators a national forum to coordinate bank and nondepository supervision and to develop regulatory policy. As the chartering and supervisory authorities for more than 79% of the banks in the United States, and the licensing and regulatory authorities for more than 25,500 nondepository financial services providers, including Figure, CSBS's members are charged with

Case 1:50-cv-03583-DLF   Document 1   Filed 13/03/50   Page 10 of 10

protecting consumers, ensuring safety and soundness of the institutions under their authority, and encouraging economic prosperity in their states.

33. In addition to having standing in its own right, based on the injuries it has suffered and will imminently suffer, Plaintiff CSBS also has associational standing to bring this action because (1) its members would otherwise have standing to sue in their own right; (2) the interests CSBS seeks to protect are germane to its purpose; and (3) neither the claims asserted nor the relief sought requires the participation of individual members in this lawsuit. *See Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Indeed, courts have previously recognized CSBS's associational standing to challenge actions of the OCC. *See Conference of State Bank Supervisors v. Lord*, 532 F.Supp. 694, 695 (D. D.C. 1982); *aff'd sub nom*. *Conference of State Bank Supervisors v. Conover*, 710 F.2d 878 (D.C. Cir. 1983).

34. Defendant Office of the Comptroller of the Currency is a bureau of the United States Department of the Treasury and functions as the primary supervisor of federally chartered national banks. Its offices are located at 400 7th Street S.W., Washington, DC 20219.

35. Defendant Brian Brooks is the current Acting Comptroller of the Currency and is named in his official capacity.

## JURISDICTION AND VENUE

36. This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 500-596, 701 *et seq.*, the National Bank Act, 12 U.S.C. § 1, *et seq.*, and 12 U.S.C. § 21, *et seq.*, the Federal Reserve Act, 12 U.S.C. §§ 221 *et. seq.*, and the Federal Deposit Insurance Act 12 U.S.C. §§ 1811 *et. seq*. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

37. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1).

# BACKGROUND

## I.    Insured Banks and Nonbanks are Distinct Types of Institutions Subject to Distinct Systems of Regulation.

38.    In the United States, insured banks and nonbanks are different types of institutions and are subject to distinct systems of financial regulation administered by different regulatory authorities.

39.    Insured banks are banking corporations chartered under special federal or state incorporation laws enabling the formation of commercial banks that engage in receiving deposits and obtain federal deposit insurance, in addition to engaging in nondepository financial activities such as lending money and paying checks.

40.    Nonbanks, such as Figure, are not banks. These nonbank entities are natural persons or entities organized under general incorporation laws that engage in nondepository financial activities, such as lending and transmitting money, but do not engage in receiving deposits and are prohibited from doing so by federal and state laws.

41.    In fact, the laws of every state prohibit the use of the term "bank" in naming a nonbank, prohibit nonbanks from creating the impression that they are banks, and prohibit general business corporations, such as Figure, from carrying on the business of banking.

42.    Nonbanks are not subject to federal and state banking laws because they are not required to obtain a bank or other depository institution charter to simply lend or transmit money.

In contrast, since the creation of the system of federal deposit insurance in 1933, federal law has prohibited institutions from taking deposits unless they obtain a bank or other depository institution charter and thereby become subject to banking regulation. 12 U.S.C. § 378(a)(2).

43.    Unauthorized banking laws in every state likewise treat deposit-taking as the exclusive privilege of commercial banks and other depository institutions (such as savings

12

associations and credit unions). By restricting the activity of deposit taking to insured depository institutions, federal and state laws ensure that banking is subject to bank regulation, while still preserving the rights of individuals and entities, such as Figure, to engage in nondepository financial activities.

44.     Thus, the only reason that an institution seeking to undertake financial activities is required to obtain a bank charter is to engage in receiving deposits, and, conversely, it is unnecessary for nonbanks, such as Figure, to obtain a national or state bank charter simply to conduct financial activities other than deposit-taking. For this reason, a separate and distinct system of regulation has been established to regulate the financial activities of nonbanks.

45.     Because insured banks are subject to a distinct and comprehensive regulatory scheme, they are generally not bound by state licensing and regulatory requirements applicable to nonbank financial institutions (like Figure), either because they are exempted or because the licensing requirement is federally preempted.

46.     Whether a bank must obtain deposit insurance from the FDIC to lawfully conduct its business is generally governed by federal law for federally-chartered banks and state law for state-chartered banks. Federal law requires national banks to be insured banks and, likewise, virtually all states require state-chartered banks to be insured banks.

47.     Even in those states that permit the formation of noninsured banks, these noninsured state banks would not receive the benefits that accrue to an insured state bank—in particular, federal preemption and access to the federal safety net—because the FDIA affords these privileges only to insured state banks. *See e.g.*, 12 U.S.C. § 1831d.

Case 1:50-cv-03382-BTL-Z Document 1 Filed 13/53/50 Page 13 of 10

13

### A. Both the OCC and the States Charter and Regulate Insured Banks Concurrently, as Part of the U.S. Dual-Banking System.

48.     The federal government and state governments exercise concurrent authority over insured banks under their respective special incorporation laws, which enable them to charter and regulate commercial banks.

49.     This allocation of chartering and regulatory authority is referred to as a "dual banking system" because, in seeking to form a bank, organizers can choose to apply for a state charter issued by one of CSBS's members, or for a federal charter issued by the OCC.

50.      National banks are commercial banks chartered and regulated primarily by the OCC, while state banks are commercial banks chartered and regulated primarily by their state chartering authority in conjunction with either the FDIC or the Federal Reserve System ("FRS").

51.     National banks are required to become members of the FRS, while, for state banks, Federal Reserve membership is optional. *See* 12 U.S.C. §§ 222 (national banks) and 321 (state banks). State banks that become FRS members have the FRS as their primary federal regulator, while state banks that do not become FRS members have the FDIC as their primary federal regulator.

52.     As a condition of Federal Reserve membership, national banks are required to apply for, obtain, and maintain deposit insurance from the FDIC. 12 U.S.C. §§ 222, 1818. Thus, national banks chartered by the OCC to carry on the business of banking must be FDIC-insured

banks to lawfully commence the business of banking. But the Figure Charter Application indicates that Figure would not comply with this requirement and, instead, will become a Federal Reserve member without applying for or obtaining deposit insurance from the FDIC.

53.     The FRA, FDIA, and other federal banking laws impose uniform prudential and safety and soundness requirements on insured national and state-chartered banks, including, but

14

not limited to, generally applicable capital requirements, community reinvestment requirements, regular examination, uniform supervisory ratings, lending limits, and restrictions on unsafe and unsound banking practices. These prudential rules and requirements generally apply to "insured banks" or "insured depository institutions" more broadly and thus become applicable upon obtaining deposit insurance from the FDIC. Because Figure will not be an insured bank, none of these rules and requirements will apply to Figure.

54.     Federal banking laws also impose restrictions on the organizational structure, control, affiliation, merger and acquisition, and conversion of national and state banks. For instance, any parent company that controls a "bank" is deemed a "bank holding company" pursuant to the Bank Holding Company Act ("BHCA"), and is subject to regulation and supervision by the FRS and restricted to conducting only those activities that are deemed by the FRS to be "closely related to banking." 12 U.S.C. § 1843(c)(8). Because it will not be an insured bank, Figure Bank will not be a "bank" under BHCA and, therefore, its holding company, Figure Technologies, and any successor thereto will not be subject to the BHCA or limited to activities "closely related to banking."

55.     Lastly, in the event of insolvency, unlike other commercial enterprises and nondepository financial institutions licensed by the states, such as Figure, insured banks are ineligible for bankruptcy. *See* 11 U.S.C. § 109(b), (d). Instead, insured banks are subject to a special resolution regime outside of bankruptcy that involves seizure of insolvent or unsound banks and resolution through an FDIC receivership.

56.     These extensive regulations applicable to insured banks—including the prudential regulations, structural restrictions, and special resolution mechanisms mentioned above—have developed over time and in recognition that the special deposit-taking power of banks poses a

special hazard to the public that necessitates the application of "cradle-to-grave" regulation to the entirety of bank operations, in order to reduce the likelihood and severity of bank failure. Nevertheless, Figure will operate free of these regulations and restrictions since it will not be an insured bank.

57.     As recompense for the unparalleled stringency and intrusiveness of insured bank regulation, insured banks are given certain regulatory privileges not afforded other institutions. One of the most significant privileges afforded insured banks is federal preemption of state law and regulation. The OCC intends to grant Figure and other Nonbank Charter recipients the benefit of these privileges without requiring it to incur the concurrent regulatory responsibilities that justify the privileges.

## B.     CSBS's Member States Have Always Had Primary Responsibility For Licensing and Regulating Nondepository Financial Institutions ("Nonbanks").

58.     For more than a century, states have regulated nonbank financial activities by requiring all persons and corporations to obtain a state license to engage in such activities in a business capacity.

59.     These state laws impose licensing and other regulatory requirements on nondepository financial institutions that provide certain consumer financial services and delegate the authority to regulate and supervise such institutions to the state banking and financial agencies that are CSBS's members. Generally, nondepository institutions must obtain a license in every state in which they seek to engage in financial activities subject to licensure. Additionally, these entities are generally subject to ongoing oversight through periodic regulatory reporting requirements and examinations by state regulators.

60.     The nondepository financial activities subject to licensing and regulation by the states generally include mortgage lending and servicing, consumer lending and servicing,

Case 1:50-cv-03183-DLF   Document 1   Filed 15/33/50   Page 16 of 10

money-services businesses and money transmission, debt collection, credit-service businesses, credit bureaus, payday lending, title lending, auto lending and auto loan servicing, and student lending and student-loan servicing.

61.    State laws impose product restrictions on these nondepository institutions, such as restrictions on interest rates and finance charges. State laws also impose business conduct requirements—such as prohibitions on unfair, abusive, or deceptive acts and practices; restrictions on predatory lending; customer communication restrictions; disclosure requirements; permissible investment requirements; and net worth requirements.

62.    State laws governing consumer lending require the licensure and regulation of institutions engaging in the business of lending money to persons on an unsecured basis below a certain amount and/or above a certain percentage rate. Some of these laws also apply to commercial lending, in addition to lending for household, family, and personal purposes.

63.    State regimes governing money transmission and other money-transfer services generally apply to businesses that provide check cashing, currency exchange, or money transmitting or remittance services, or issue or redeem money orders, traveler's checks, and other similar instruments.

64.    All 50 states require any person or company that negotiates, makes, or offers to make mortgage loans to obtain a mortgage lending license. Under these licensing laws, nonbank mortgage lenders are subject to restrictions on product terms and business conduct, as well as

pre-licensure and continuing education standards and character and fitness requirements. These requirements conform to the Secure and Fair Enforcement for Mortgage Licensing Act of 2008 ("SAFE Act"), which set minimum standards for state licensure of nonbank mortgage lenders and called for the states to establish the Nationwide Mortgage Licensing System ("NMLS"),

administered by CSBS. Today, NMLS is administered by CSBS on behalf of its members and serves as the system of record for state licensure of nonbank money transmitters, consumer lenders, and other licensed nonbank financial institutions.

65. Through its subsidiary, Figure Lending LLC, Figure currently is licensed and regulated by state regulators as a mortgage lender, consumer lender, and/or debt collector in 49 states and the District of Columbia. It holds a total of 95 state licenses covering these loan-related activities. *See* Figure Lending LLC (NMLS ID: 1717824), State Licenses/Registrations, NMLS Consumer Access (Dec. 21, 2020) (attached here to as Exhibit A).

66. Additionally, upon information and belief, through another subsidiary, Figure Payments Corporation, Figure intends in early 2021 to begin engaging in additional money-transmission activities through a new product offering. On September 22, 2020, Figure registered with the U.S. Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") as a money-services business engaged in money transmission in all 50 states. These new money-transmission activities will be subject to state money-transmission licensing requirements as well (unless improperly preempted by a national bank charter granted by the OCC).

67. Thus, Figure's offerings fall squarely within the types of money-lending and transmitting activities performed by nondepository institutions that CSBS's members have overseen for more than a century.

## II. The National Bank Act Allows National Banks to Escape the Application of State Law Under Certain Circumstances.

68. The NBA and the OCC's implementing regulations preempt a number of state laws, including but not limited to state laws authorizing state regulation of national banks, state laws that conflict with a national bank's exercise of its powers, and state usury laws.

69.     Under the NBA, national banks are subject exclusively to the regulatory authority of the OCC and, thus, state laws authorizing state bank regulators to apply state regulation to national banks and otherwise supervise and examine national banks are expressly preempted. 12 U.S.C. § 484; 12 C.F.R. § 7.4000 (2020).

70.     Furthermore, under the NBA, "state consumer financial laws" that "prevent or significantly interfere" with a national bank's exercise of its powers are preempted. *See* 12 U.S.C. § 25b. In its regulations, the OCC has listed certain categories of state laws that are said to be preempted under this standard—such as state laws governing loan terms, interest rates, advertising, and disclosure. 12 C.F.R. §§ 7.4007, 7.4008, and 34.4 (2020).

71.     These regulations also provide that any state licensing laws that require national banks to obtain a license or to register with the state before exercising a federally-granted authority—including the activities of lending and transmitting money—are preempted because they interfere with a national bank's exercise of its powers. 12 C.F.R. §§, 7.4008(d)(1); 7.5002(c); 34.4(a)(1) (2018).

72.     Moreover, Section 85 of the NBA expressly preempts state usury laws in certain circumstances. For example, under the "most favored lender" reading of Section 85, the maximum rate permitted to be charged on loans extended by national banks is the rate of interest allowed by the laws of the state where the bank is located, even if that rate is higher than the rate permitted by state law for state banks. 12 U.S.C § 85a; 12 C.F.R. §§ 7.4001(b).

Case 1:30-cv-03583-DFE   Document 1   Filed 13/35/30   Page 78 of 30

73.     Additionally, Section 85 permits the interstate "exportation" of interest rates—allowing the bank to apply the maximum permissible rate in the state in which the bank is located to loans to customers residing in a different state, even if the rate exceeds the highest permissible rate in that state. 12 USC § 85. Further, "interest" under Section 85 has been

interpreted to include a wide variety of finance charges and fees and preempts conflicting state law definitions of interest. 12 U.S.C. § 85; 12 C.F.R. § 7.4001(c).

74.    As the OCC has stated, making this extensive preemption available to nonbank financial institutions to which it would not otherwise apply is the primary purpose for which the OCC has created the Nonbank Charter, *see* OCC Policy Statement on Financial Technology Companies' Eligibility to Apply for National Bank Charters, p.2 (July 31, 2018) ("the OCC's uniform supervision . . . will help promote consistency in the application of laws and regulations across the country"), and is the primary reason that Figure has applied for a Nonbank Charter, *see* Figure Charter Application, p. 5 ("Figure Bank will enable Figure Group to offer a cohesive set of products and services to its customers nationwide, to focus its compliance efforts on the requirements of a single regulator, . . .").

**A.    Congress Has Consistently and Repeatedly Rejected the Sweeping Preemption that the OCC Seeks to Allow.**

75.    As recent history has shown, given the broad nature of NBA preemption, its extension to nondepository institutions is not good public policy. Indeed, it is widely accepted that by insulating nondepository mortgage company subsidiaries of national banks from supervision and enforcement authority of state regulators and state attorneys general, and by asserting preemption of state anti-predatory lending laws from the mid-1990s to the early 2000s, the OCC played a pivotal role in laying the legal foundation for the subprime lending abuses that

Case 1:20-cv-03187-DLF   Document 1   Filed 12/22/20   Page 20 of 70

bore out during the financial crisis in the years that followed. *See* Arthur E. Wilmarth Jr., *The Dodd Frank Act's Expansion of State Authority to Protect Consumers of Financial Services*, 36 J. Corp. L. 893, 897-918 (2011).

76.    To correct the OCC's regulatory overreach, Congress enacted the Dodd-Frank Act in 2010, amending the NBA to rescind the OCC's extension of NBA preemption to

nondepository subsidiaries of national banks, making those subsidiaries subject to state consumer financial laws. *See* 12 U.S.C. § 25b(b)(2), (e), (h). Congress also took significant steps to limit the OCC's authority to preempt state consumer financial laws, including through the imposition of new substantive and procedural requirements and heightened standards of review. *See* 12 U.S.C. § 25b(b), (c), (d), (g).

77. State government officials have expertise in the banking practices and market conditions in their communities, which makes them uniquely situated to recognize and act upon consumer financial protection issues. Due to state regulators' proximity to the consumers and communities they are charged with protecting, and their accountability to the state legislatures that promulgate state consumer financial laws, state regulators are best positioned to apply, interpret, and enforce state consumer financial laws. In contrast, centralized federal agencies lack local accountability and visibility.

78. Additionally, for more than a century, state banking regulators have led the way in promoting and enabling financial innovation, being the first to allow such new ideas as interest-bearing checking accounts, home equity loans, and automated teller machines— innovations that were subsequently adopted in the national banking system. Today, state banking regulators and state-chartered banks continue to enable and foster innovation in many ways– bringing innovations to market through a multitude of paths that include building in-house technology capabilities and/or leveraging external partners.

Case 1:30-cv-09319-LSFL-09xumustr1 Filed 7/9/30 Page 21 of 70

79. Importantly, regulators in the dual-banking system have enabled the emergence of these innovations by embracing and building upon the essential attributes that make a bank what it is, not by denying those attributes and deconstructing banking simply to enable the circumvention of existing regulatory systems.

80.     Ultimately, the dual-banking system thrives when it operates as intended, not when bank regulators enable arbitrage by seeking to exploit purported ambiguity in foundational statutory terms with well-settled meanings (as OCC has done here). The system succeeds when bank regulators embrace the dynamic of competitive federalism to encourage banks to deliver innovative solutions that further the purpose for which they are chartered, namely, to lawfully carry on the business of banking.

## III.     Congress Limited the OCC's Statutory Power to Chartering National Banking Associations for "Carrying on the Business of Banking."

81.     The NBA, enacted in 1863 and substantially revised in 1864, created the national banking system and established the OCC as a bureau within the Treasury Department with responsibility for supervising these federally chartered banks. *See* 12 U.S.C. § 1, *et seq.*; 12 U.S.C. § 21, *et seq.* (Title LXII of the Revised Statutes).

82.     The OCC is responsible for ensuring federally chartered banks' safety and soundness, compliance with federal banking laws, and compliance with federal laws regarding fair access to financial services and fair treatment of customers. 12 U.S.C. § 1(a). The OCC is authorized to "prescribe rules and regulations to carry out the responsibilities of the office." 12 U.S.C. § 93a.

83.     The NBA is a bank incorporation law enabling the chartering of national banks. Under the NBA, national banks are formed for "carrying on the business of banking," 12 U.S.C.

§ 21, and are granted the powers necessary to pursue this purpose. *See* 12 U.S.C. § 24. To organize a national bank, the NBA requires incorporators to file articles of association and an organization certificate with the OCC. *See* 12 U.S.C. § 21-22. For the OCC to be authorized to grant the charter, the association must be "lawfully entitled to commence the business of banking" and formed for the "legitimate objects" contemplated by the NBA. 12 U.S.C. §§ 26-27.

## A. The Essential, Unambiguous Meaning of the "Business of Banking" Necessarily Includes the Receiving of Deposits.

84. The NBA, both on its own and when read together with other federal banking laws, specifies the minimum, essential meaning of the "business of banking." Indeed, the text of the Act, judicial interpretations of the Act, and subsequently enacted federal banking laws interrelated with the Act—including the FRA, the National Banking Acts of 1933 and 1935, FDIA, and BHCA—all indicate that engaging in receiving deposits is a necessary condition of carrying on the banking business under the NBA.

85. First, the plain language of the NBA chartering provisions require incorporators to identify in the organization certificate the place where the national bank's "operations of discount and deposit are to be carried on" and refers to such operations elsewhere as "the general business of each national bank association." 12 U.S.C. §§ 22, 81. This provision of the NBA, unmodified since the Act's passage in the 1860s, gives a clear indication that, in enacting the NBA, Congress identified deposit taking as an indispensable function necessary to carry on the business of banking.

86. Additionally, in interpreting the meaning of the business of banking under the NBA, the OCC has stated that "the National Bank Act essentially reduces the business of banking, in perhaps its simplest form, to accepting deposits, making loans, and paying checks." *See* 1985 OCC QJ LEXIS 812, *21-22, *cited with approval in Dep't of Banking & Consumer Fin. v. Clarke*, 809 F.2d 266, 270 (5th Cir. 1987) ("Congress has defined the business of banking, stripped to its essentials, as accepting deposits, paying checks, and making loans"), *cert denied* 483 U.S. 1010 (1987). Thus, the OCC and the courts have previously interpreted and defined the business of banking as requiring engaging in all three core banking functions, including the function of receiving deposits.

87. More generally, courts that have interpreted the term "business of banking" as used in the NBA have taken note of the essential nature of deposit taking. *See, e.g., United States v. Philadelphia National Bank*, 374 U.S. 321, 326 (1963)("[c]ommercial banks are unique among financial institutions in that they alone are permitted by law to accept demand deposits.") (emphasis added). Indeed, as put by the Ninth Circuit, "the deposit and withdrawal of funds 'are services provided by banks since the days of their creation. Indeed, such activities define the business of banking.'" *See Gutierrez v. Wells Fargo Bank*, 704 F.3d 712, 723 (9th Cir. 2012) (quoting Bank of Am. v. City & Cty. of S.F., 309 F.3d 551, 563 (9th Cir. 2002)).

88. Additionally, other federal banking laws that have a practical interrelation with the NBA confirm that receiving deposits is required to carry on the business of banking.

89. For example, in order to comply with the NBA requirement that the applicant be "lawfully entitled to commence" the business of banking (12 U.S.C. §§ 26-27), the FRA requires that an applicant be capable of becoming a member of the FRS and an insured bank under the FDIA upon "commencing business." 12 U.S.C. § 222. A national bank that fails to become (or cannot become) an FRS member and obtain deposit insurance from the FDIC forfeits "all of the rights, privileges, and franchises" granted to it under the NBA. 12 U.S.C. § 501a.

90. However, a national bank cannot obtain deposit insurance unless it takes deposits, because the FDIA expressly requires that a national bank be "engaged in the business of receiving deposits other than trust funds" to be eligible to be an "insured bank." 12 U.S.C. § 1815(a)(1). Therefore, absent specific congressional authorization, a national bank must, at a minimum, be "engaged in the business of receiving deposits" in order to comply with obligations imposed under the FRA and FDIA and thereby be "lawfully entitled to commence the business of banking" under the NBA.

91.     Additionally, through the definition of "bank" in the BHCA, 12 U.S.C. § 1841, *et seq.*, Congress likewise has recognized that receiving deposits is a required function in order to be engaged in the "business of banking." The BHCA definition of "bank" and the NBA term "business of banking" should be interpreted together in a coherent fashion because they serve a similar purpose of restricting entry into the banking system. *See Whitney Nat'l Bank v. Bank of New Orleans & Tr. Co.*, 379 U.S. 411, 417-26 (1965).

92.     Section 2(c)(1) of the BHCA defines a "bank" to include an institution that, at a minimum, engages in the business of receiving deposits. See 12 U.S.C. §§ 1841(c)((1)(A) and (B). Congress purposely crafted this definition to ensure that it covers all institutions chartered to carry on the business of banking, and thus its focus on deposit-taking represents a recognition by Congress that receiving deposits is necessary to carry on the banking business. Accordingly, any definition of the "business of banking" in the NBA that does not require receiving deposits is plainly in conflict with the BHCA and undermines Congressional intent to restrict entry into the banking system.

93.     Lastly, in prohibiting receiving deposits without obtaining a bank charter, the federal and state unauthorized banking laws and the extensive body of precedent interpreting these laws indicate that deposit-taking is a function indispensable to engaging in the business of banking. *See*, *e.g.*, 12 U.S.C. § 378(a)(2); *Davis v. W.J. West & Co.*, 127 Ga. 407 (1907).

94.     The fundamental proposition underlying these laws is that institutions may conduct all manner of financial activities (some of which, such as lending and transmitting money, may even be core to the banking business), but it is only when financial activities are conducted in concert with the function of receiving deposits that those activities take on the character of banking activities.

95. In sum, read together and in a manner consistent with other banking laws, the NBA must be interpreted to reflect the consistent, settled understanding of Congress and the courts that engaging in receiving deposits is indispensable to "carrying on the business of banking."

96. For these reasons, as previously noted, a federal court has already struck down the OCC's Nonbank Charter Program, concluding that "the NBA's 'business of banking' clause, read in the light of its plain language, history, and legislative context, unambiguously requires that, absent a statutory provision to the contrary, only depository institutions are eligible to receive national bank charters from OCC." *Vullo* Ruling, 378 F. Supp. 3d at 298.

**B.     Applying for and obtaining deposit insurance from the FDIC is necessary for a national bank to lawfully commence the business of banking.**

97. Since Congress first established the federal deposit insurance system in 1933, national banks have been required not only to be eligible for deposit insurance (by engaging in receiving deposits) but to actually *obtain* deposit insurance from the FDIC. *See* Act of June 16, 1933, ch. 89, § 8, 48 Stat. 162, 179; Act of Aug. 23, 1935, ch. 614, § 101, 49 Stat. 685, 688, 691.

98. Although the deposit insurance provisions of the Banking Acts of 1933 and 1935 were subsequently incorporated into an independent act with the enactment of the Federal Deposit Insurance Act of 1950, Pub. L. 81–797, 64 Stat. 873, Congress maintained the deposit insurance mandate in the FRA. *See* 12 U.S.C. § 222. As a result, from 1933 to today, every

Case 1:20-cv-03734-DLF   Document 1   Filed 12/22/20   Page 26 of 70

institution chartered by the OCC to carry on the business of banking has been a FDIC-insured bank.

99. The requirement that national banks become FDIC-insured banks has always been contained in the FRA and the FDIA because these laws, in equal measure to the NBA itself, govern the powers, rights and privileges of national banks, which are automatic members of the

FRS. *See*, *e.g.*, 12 U.S.C. § 371 (granting national banks the power to originate mortgage loans); 12 U.S.C. § 1816(7) & 12 C.F.R. § 5.20(a) (providing that all of the powers of national banks must be "consistent with the purposes of the [FDIA].").

100.    To be eligible to obtain deposit insurance, an institution must obtain a federal or state depository institution charter and, upon commencing business, be "engaged in the business of receiving deposits other than trust funds" as defined in the FDIA. 12 U.S.C. § 1815(a)(1). The FDIC has established that an institution is "engaged in the business of receiving deposits other than trust funds" only if it "maintains one or more non-trust deposit accounts in the minimum aggregate amount of $500,000." 12 C.F.R. § 303.14.

101.    Only the FDIC is authorized to make a final determination as to whether or not a proposed bank would, in fact, be "engaged in the business of receiving deposits, other than trust funds" (*see* 12 U.S.C. §§ 1815(a)(6), 1818(p)) because, among other things, the FDIC has the exclusive authority to define what liabilities of a bank constitute "deposits" under the FDIA. *See* 12 U.S.C. § 1813(l)(5). Therefore, the initial determination of a bank chartering authority— whether that authority is the OCC or a state bank regulator—as to whether or not a proposed bank's liabilities qualify as a "deposit" as defined in the FDIA, or whether that proposed bank would or would not "be engaged in the business of receiving deposits" is precatory in nature, rather than authoritative.

102.    The FDIA definition of "deposit" is incredibly broad and, in general, encompasses "the unpaid balance of money or its equivalent received or held by a bank or savings association" and "such other obligations" that the FDIC finds "to be deposit liabilities by general usage." 12 U.S.C. § 1813(l); *see also*, *e.g.*, FDIC General Counsel's Opinion No. 8, FIL-

27

129-2008 (Nov. 13, 2008) (available at https://www.fdic.gov/regulations/laws/rules/5500-500.html).

103. If an institution applies to the FDIC for deposit insurance, the FDIC will determine whether the institution is eligible and qualified for deposit insurance, and if FDIC approval is obtained, then the institution will become an "insured depository institution" or, more specifically in the case of a national bank, an "insured bank." 12 U.S.C. § 1813(c)(1), (h).

104. All of the "deposits" in an insured bank will be insured equally by the FDIC; the FDIA does not distinguish between different types of deposit accounts or depositors for insurance purposes. Specifically, the FDIC will "aggregate the amounts of all deposits in the insured depository institution which are maintained by a depositor in the same capacity and the same right for the benefit of the depositor, either in the name of the depositor or in the name of any other person." 12 U.S.C. § 1821(a)(1)(C).

105. The amount due to any individual depositor for deposits in the insured depository institution not in excess of the "standard maximum deposit insurance amount" (currently $250,000) will be "insured deposits," 12 U.S.C. § 1813(m)(1), and amounts in excess will be "uninsured deposits," 12 U.S.C. § 1813(m)(3). Thus, after becoming an insured depository institution, a bank cannot elect to treat an entire deposit account as an "uninsured deposit" and thereby deny deposit insurance coverage to the deposits of its depositors.

Case 4:50-cv-03183-DPJ-FKB Document 1 Filed 11/05/50 Page 38 of 70

106. Lastly, after having become an insured depository institution, a national bank, as a member of the FRS, is prohibited from voluntarily terminating its insured status. *See* 12 U.S.C. § 1818(a)(1)(A). If a national bank ceases to be a FRS member or ceases to engage in the business of receiving deposits other than trust funds, its insured status will be involuntarily terminated. *See* 12 U.S.C. § 1818(p). In turn, the loss of FRS membership or insured bank status results in

28

the forfeiture of the rights, privileges, and franchises conferred with the national bank charter. *See* 12 U.S.C. §§ 222, 501a.

107. Thus, national banks have not only always been required to obtain deposit insurance to lawfully commence the business of banking, they have also always been required to maintain their insured bank status to maintain their corporate existence as a national bank.

108. In fact, when Congress revised the FDIA in 1989 and 1991 to require national banks to submit a separate application for deposit insurance, rather than obtain it automatically, the FRB continued to interpret Section 12 U.S.C. § 222 as an independent deposit insurance requirement—and Congress rejected the Comptroller's urging to repeal that requirement. *See* Economic Growth and Regulatory Paperwork Reduction Act: Hearing on S. 650 Before the S. Comm. on Banking, 104th Cong., 91-92 (1995) (testimony of Comptroller indicating that the FRB interprets Section 222 to "require a national bank both to become a member of the Federal Reserve and to be insured by FDIC" and advocating for its repeal to allow for the chartering of uninsured national banks).

## IV. The OCC's Authorization to Issue Special-Purpose Charters Is Limited to Specific Categories of Special Purpose National Banks.

109. The Nonbank Charter Program is not the first time OCC has exceeded the limits of its chartering authority. Each time the OCC has created charters for entities that could not lawfully carry on the business of banking, the courts struck down those efforts, concluding that OCC is not empowered by the NBA to charter such institutions unless specifically authorized by Congress.

110. For example, in 1977 a federal district court rejected the OCC's efforts to charter a national bank whose activities would be limited to the fiduciary services provided by a trust company—holding that the OCC lacked authority to charter an institution that would not engage

in the business of banking, including receiving deposits. *National State Bank v. Smith*, No. 76-1479 (D. N.J. Sept. 16, 1977), *rev'd on other grounds*, 591 F.2d 223 (3d Cir. 1979).

111. In response to this defeat, the OCC asked Congress to expand its authority. It requested from Congress an amendment to the NBA that would specifically authorize the Comptroller to charter national trust banks. Congress adopted the requested amendment in 1978 as part of the Financial Institutions Regulatory and Interest Rate Control Act ("FIRIRCA"), 12 U.S.C. § 27(a). Congress thereby gave the OCC specific authorization to create national trust companies, the first type of special-purpose chartering authority conferred upon the OCC.

112. In the following decade, a federal district court once again blocked the OCC's efforts to issue special-purpose charters beyond its authority, granting an injunction prohibiting the OCC from issuing special-purpose charters to "nonbank banks" —that is, institutions chartered by the OCC that escaped regulation under the BHCA because they either did not accept demand deposits or make commercial loans and thus did not qualify as "banks." *Independent Bankers Assn. of America v. Conover*, No. 84-1403-CIV-J-12, 1985 U.S. Dist. LEXIS 22529, Fed. Banking L. Rep. (CCH) P86, 178 (M.D. Fla. Feb. 15, 1985).

113. Following the OCC's defeat in *Conover*, Congress declined to adopt legislation extending to the OCC the special-purpose chartering authority it had attempted to assert with respect to "nonbank banks." To the contrary, Congress took steps to codify the Conover ruling by amending the BHCA, through the Competitive Equality Banking Act ("CEBA"), to make it clear that financial institutions that are not eligible to obtain and do not obtain deposit insurance are not "banks." *See* 12 U.S.C. § 1841(c); *see also* S. Rep. No. 100-19, at 7 (1987).

114. Ultimately, the OCC is permitted to charter a national bank only: (1) where the institution is organized to lawfully carry on "the business of banking," which, under current law,

includes at a minimum taking deposits and obtaining deposit insurance—and thus is a "full-service national bank"—or (2) where Congress has taken specific legislative action to allow the OCC to charter an entity to carry on a special purpose other than the business of banking—and thus is a "special purpose national bank."

115.    Currently, Congressional authorization exists to charter only two categories of special purpose national banks: trust banks and banker's banks. 12 U.S.C. § 27(a)(last sentence) and (b). Specific legislative authorization was required for trust banks and banker's banks because solely providing fiduciary services or correspondent banking services did not, under existing law, qualify as lawfully carrying on the business of banking. This would not have been necessary if the OCC already possessed the broad authority it now claims.

## THE OCC'S NONBANK CHARTER PROGRAM

**I.      The OCC's Announcement of the Nonbank Charter Program in 2016 Meets with Objections and Concern.**

116.    The OCC first formally announced its intent to establish the Nonbank Charter Program in December 2016, ultimately finalized its establishment and invited applications for Nonbank Charters in July 2018, and accepted its first application for a Nonbank Charter in November 2020 in the form of the Figure Charter Application.

117.    The OCC's proffered legal basis for the Nonbank Charter has remained unchanged: national banks need not be eligible for, or obtain, deposit insurance from the FDIC in

order to lawfully commence business. In other words, the OCC asserted that it could, under its chartering authority, exempt proposed national banks from the deposit insurance mandate by making a final determination that they would not be eligible for or required to obtain deposit insurance.

118.    For instance, the white paper released by the OCC when it first announced its intent to establish the Nonbank Charter Program on December 2, 2016, "Exploring Special Purpose National Bank Charters for Fintech Companies" (available at https://occ.gov/publications-and-resources/publications/banker-education/files/exploring-special-purpose-nat-bank-charters-fintech-companies.html), asserted that the OCC has the authority to charter special purpose national banks that the OCC determined would not engage in receiving deposits within the meaning of the FDIA and which, therefore, would not be eligible for or obtain deposit insurance from the FDIC.

119.    The white paper cited a provision of the OCC's chartering regulation, 12 C.F.R. 5.20(e)(1)—which provided the OCC may charter a national bank that would engage in at least one of the following three core banking functions: receiving deposits, paying checks, or lending money—to support the notion that engaging in receiving deposits is not required to lawfully carry on the business of banking. And because engaging in receiving deposits was purportedly not necessary to engage in banking, being eligible for and obtaining deposit insurance was likewise purportedly not necessary for national banks to lawfully carry on the banking business. Instead, the OCC asserted, a proposed national bank need only obtain deposit insurance from the FDIC if it "proposes to accept deposits other than trust funds." *See* December 2, 2016 White Paper at p. 7.

120.    In the subsequent publications released to establish the Nonbank Charter Program, the OCC adhered to this legal position. For instance, on March 15, 2017, the OCC published a draft supplement to the Comptroller's Licensing Manual, entitled "Evaluating Charter Applications From Financial Technology Companies," ("Draft Supplement"). The Draft Supplement, citing to 12 CFR 5.20(e)(1), asserted that the OCC has the authority to charter "a

Case 1:30-cv-03083-DLF Document 1 Filed 03/03/60 Page 33 of 70

national bank that . . . does not take deposits within the meaning of the Federal Deposit Insurance Act (FDIA) and therefore is not insured by the Federal Deposit Insurance Corporation (FDIC)" It also provided that "[t]his Supplement covers entities other than . . . national banks that accept deposits and therefore must be insured by the FDIC."

121.    The OCC's initial establishment of the Nonbank Charter Program triggered significant and persistent public concern and outcry from a wide variety of stakeholders, including consumer-oriented interest groups, banking industry groups, members of Congress, academics, state attorneys general, and, of course, state regulators. These stakeholders' concerns were initially voiced through public comments on the white paper and draft licensing manual.

122.    In these public comments, stakeholders questioned the OCC's statutory authority to issue national bank charters to nonbank companies and urged the OCC to seek Congressional approval for the charter so that Congress could deliberate regarding what a federal regulatory regime for such entities should look like, how to maintain the statutory separations between banking and commerce, and how to protect the federal safety net traditionally reserved to insured depository institutions—all of which were issues OCC intended to resolve itself on an *ad hoc*, nonpublic basis.

123.    For its part, through three separate comment letters, CSBS made clear its view that the OCC lacked statutory authority to issue these Nonbank Charters because national banks are required to engage in receiving deposits and obtain FDIC insurance in order to be lawfully

Case 1:30-cv-03885-JH-L Document 1 Filed 13/53/50 Page 33 of 10

entitled to commence the business of banking and pointed out, at length, that Congress could not have intended for the OCC to resolve the many weighty public policy issues raised by creating this unprecedented type of national bank charter. CSBS further explained that such charters would distort the marketplace for financial services and create tremendous uncertainty and risks

pertaining to access to critical government resources, including the payments system and the federal safety net. Additionally, CSBS highlighted that the preemptive effect of the charter nullifies the states' ability to protect customers.

124.    Recognizing that the OCC had not responded to the numerous concerns raised regarding the Nonbank Charter Program and intended to move forward with its plan to exceed its statutory authority by issuing Nonbank Charters, CSBS initiated a legal action against the OCC and Comptroller Curry in this Court in April 2017, seeking declaratory and injunctive relief.

125.    In August 2017 the OCC moved to dismiss CSBS's lawsuit, arguing that the suit was premature because the agency was still deciding whether it would actually exercise its newly claimed power. Relying upon OCC's representations that it had not yet decided to move forward with the Nonbank Charter Program, the Court dismissed CSBS's complaint without prejudice on April 30, 2018. *See generally Conference of State Bank Supervisors v. Office of the Comptroller of the Currency*, 17-cv-763-DLF, Doc. No. 19 (D.D.C., Apr. 30, 2018).

## II.    Despite Widespread Public Concern, the OCC Formally Establishes the Nonbank Charter Program in 2018 and Invites Applications for Nonbank Charters.

126.    Within a mere three months of the dismissal of CSBS's suit, however, the OCC on July 31, 2018 announced it had begun accepting applications for Nonbank Charters. *See* Press Release, *OCC Begins Accepting National Charter Applications from Financial Technology Companies* (July 31, 2018) (available at https://www.occ.gov/news-issuances/news-releases/2018/nr-occ-2018-74.html).

127.    In formally establishing the Nonbank Charter Program, the OCC again asserted that it had the authority to create the Nonbank Charter because its chartering authority ". . . does not require the bank to take deposits within the meaning of the Federal Deposit Insurance Act and therefore would not require insurance from the Federal Deposit Insurance Corporation." *Id*.

34

128.     On the same day, the OCC published a Policy Statement as well as a finalized supplement to its Licensing Manual explaining the policies and procedures governing applications and supervisory expectations for special purpose charters from nonbank fintech companies. *See* OCC Policy Statement dated July 31, 2018[1] and Comptroller's Licensing Manual Supplement: Considering Charter Applications from Financial Technology Companies.[2]

129.     The Licensing Manual Supplement reiterated that the special purpose charter was intended for nonbank fintech companies that would not, as a condition of obtaining the charter, be required to obtain deposit insurance from the FDIC. *See id.* at pp. 2-3. The Manual Supplement further directed any institution that intended to take deposits and obtain FDIC insurance to apply for a full-service national bank charter. *See id*. All other applicants were directed to apply for a Nonbank Charter.

130.     Thus, in formally establishing the Nonbank Charter Program, the OCC adhered to the position that a proposed national bank need not obtain FDIC insurance to lawfully commence the banking business because deposit-taking was not necessary to engage in banking, Rather, as the OCC continued to maintain, it was only necessary for proposed national banks to obtain deposit insurance if the OCC determined that a proposed national bank would be receiving deposits and thus would be eligible for deposit insurance within the meaning of the FDIA.

---

[1] *See* Policy Statement on Financial Technology Companies' Eligibility to Apply for National Bank Charters, Office of the Comptroller of the Currency, July 31, 2018 (available at https://www.occ.gov/news-issuances/news-releases/2018/pub-other-occ-policy-statement-fintech.pdf).

[2] *See* Comptroller's Licensing Manual Supplement: Considering Charter Applications From Financial Technology Companies, Office of the Comptroller of the Currency, July 2018 (available at https://www.occ.gov/publications-and-resources/publications/comptrollers-licensing-manual/files/considering-charter-apps-from-fin-tech-companies.html).

## III.    The Nonbank Charter Program is Ruled Invalid and Set Aside.

131.    In the ensuing months, the OCC again faced separate lawsuits initiated by CSBS and NYDFS challenging the Nonbank Charter Program.

132.    Although the OCC had not yet accepted an application for the Nonbank Charter, in May 2019, the SDNY in the *Vullo* Ruling denied the OCC's motions to dismiss NYDFS' complaint, holding that the OCC had exceeded its chartering authority in creating the Nonbank Charter Program because the OCC's argument that receiving deposits was not a necessary attribute of a bank was a fundamental revision of what it means to be a bank. Additionally, the court reasoned that engaging in receiving deposits is indispensable to the business of banking under the NBA, in part, because obtaining deposit insurance is required for national banks to lawfully commence the business of banking. *Vullo*, 378 F. Supp. 3d at 296 (holding that "[c]hartering national banks that do not receive deposits -- which are ineligible for insurance under the FDIA and therefore unable to join the Federal Reserve System -- would introduce an anomaly into this scheme.")

133.    The court subsequently entered a final judgment and order setting aside the regulation upon which the OCC significantly relied to support to creation of the Nonbank Charter, 12 C.F.R. 5.20(e)(1), and barring the OCC from accepting any applications for Nonbank Charters, *Lacewell v. Office of the Comptroller of the Currency*, 2019 U.S. Dist. LEXIS 182934 (S.D.N.Y. Oct. 21, 2019), a decision that is currently on appeal to the Second Circuit.

134.    Much of the briefing and legal argument in the New York litigation focused on the question of whether having and exercising the power to receive deposits was necessary to carry on the business of banking, rather than on the national bank deposit insurance mandate itself, because the OCC consistently conceded that a national bank engaged in deposit-taking must obtain deposit insurance from the FDIC. The OCC likewise conceded this point in its

36

publications related to the Nonbank Charter Program and repeatedly in the multiple rounds of litigation, including before this Court.

135. Thus, in barring the OCC from accepting applications to charter proposed national banks that would not accept deposits, the *Vullo* Ruling also prohibits the OCC from chartering a proposed national bank that would not be eligible for, apply for, and obtain deposit insurance.

136. Additionally, the effects of the *Vullo* Ruling on the OCC's chartering authority are national in scope. The OCC fought, and lost, its argument that the regulation should be set aside only as to applicants intending to operate in the State of New York. *Lacewell v. Office of the Comptroller of the Currency*, 2019 U.S. Dist. LEXIS 182934, at *2 (S.D.N.Y. Oct. 21, 2019).

## IV. Despite the *Vullo* Ruling's Limitations on its Chartering Authority, the OCC Proceeds with Accepting Applications for Nonbank Charters.

137. Despite the *Vullo* Ruling, the OCC remained undeterred in its effort to expand its authority to offer national charters to nonbanks regulated by the states. Shortly after becoming Acting Comptroller in May 2020, Acting Comptroller Brooks repeatedly disparaged the *Vullo* Ruling and asserted in multiple interviews and articles that the OCC has authority to issue Nonbank Charters.

138. When asked why the OCC could accept applications in the face of the order issued in the *Vullo* Ruling, the Acting Comptroller has sought to wish away the nationwide scope

of the *Vullo* Ruling, asserting that the OCC can continue to accept applications from entities that do not operate in New York because the ruling was just "one decision by one judge in one case in one geography."[3]

---

[3] *See* Joann Barefoot, *The First Fintech Comptroller: Acting Comptroller of the Currency Brian Brooks in his Frist Day in Office*, Barefoot Innovation, May 28, 2020, minute 26 (available at

139.    True to the OCC's stated goal of deliberately maneuvering around the adverse *Vullo* Ruling, Acting Comptroller Brooks and the OCC have solicited and worked with Figure, which upon information and belief is one of the few fintechs not currently operating in New York, to become the first Nonbank Charter applicant.

140.    In his public statements announcing the OCC's intention to accept Nonbank Charter applications, the Acting Comptroller made clear that "we don't need a new regulation or a new statute."[4] Regardless of any new labels the OCC sought to apply to these charter applications, however, it was abundantly clear that the applications the OCC was soliciting were applications for Nonbank Charters—that is, charters that would be granted without any condition that the recipient obtain deposit insurance from the FDIC. The Acting Comptroller was also clear that the value of the Nonbank Charter for companies was that it would "preempt the need" to submit to state licensing by CSBS's members, thereby reconfirming, with incredible candor, that the Nonbank Charter is primarily intended to enable nonbank financial institutions to escape state regulation.[5]

---

https://www.jsbarefoot.com/podcasts/2020/5/28/the-first-fintech-comptroller-acting-comptroller-of-the-currency-brian-brooks-on-his-first-day-in-office) (last visited December 22, 2020) (Comptroller Brooks characterizing the court's ruling); *see also* Steve Cocheo, *Fintech Charters Signal a Tectonic Realignment in Bank*, The Financial Brand (July 20, 2020)(available at https://thefinancialbrand.com/98685/occ-comptroller-brian-brooks-fintech-charter-payments-innovation-crypto-branch/).

[4] *See* Victoria Guida, *Top regulator pushes ahead with plan to reshape banking, sparking clash with states*, Politico, August 31, 2020 (available at https://www.politico.com/news/2020/08/31/currency-comptroller-reshape-banking-406393).

[5] *See* Geoffrey Etherington, Douglas Faucette, Matthew McKenna, *Payment Chapter 1.0*, JDSUPRA, July 2, 2020 (available at https://www.jdsupra.com/legalnews/payments-charter-1-0-77255/).

141.     After announcing the OCC's renewed readiness to process applications for

Nonbank Charters, Acting Comptroller Brooks subsequently reported that there was "significant

interest in federal charters,"[6] including the Nonbank Charter, among nonbank lenders, such as

Figure, as well as nonbank payments companies.[7] The Acting Comptroller also reiterated, as

initially set out in the Licensing Manual Supplement, that the OCC would follow the same

charter application process for Nonbank Charter applicants as for full-service national bank

charters, including the draft application process.

142.     The "draft application process" includes extensive meetings and consultations

between OCC staff and prospective charter applicants prior to the filing of the complete

application. The OCC uses this draft application process to obtain information from the applicant

and ensure the formal application is complete and merits approval.

143.     After the OCC announced its renewed intention to accept applications for

Nonbank Charters sometime in the fall, on information and belief, at some point in late July,

Figure began preparing an application for a Nonbank Charter, in close coordination with the

OCC. During this time, upon information and belief, Figure met with the OCC and found the

OCC to be "supportive," "accessible" and "responsive to [Figure's] questions . . . throughout

---

[6] *See* Hearing Before the Comm. on Banking, Housing, and Urban Affairs, November 10, 2020
(Statement of Brian P. Brooks, Acting Comptroller of the Currency) (available at
https://www.occ.gov/news-issuances/congressional-testimony/2020/ct-occ-2020-148-
written.pdf).

[7] *See Exclusive: OCC Chief Brian Brooks Says Payments Charter Is Ready, More Crypto Banks
Coming Soon*, Forbes, November 17, 2020 (available at
https://www.forbes.com/sites/jasonbrett/2020/11/17/exclusive-occ-chief-brian-brooks-says-
payments-charter-is-ready-more-crypto-banks-coming-soon/?sh=68d63f726266) (Referencing
"Lending Charters" and "Payment Charters").

[the] whole process" of preparing its application.[8] The OCC accepted the application approximately three months later.

## V.  Figure Applies for a Nonbank Charter, Triggering Additional Objections and Concerns.

144.    On November 6, 2020, Figure completed the draft application process and formally submitted an application to the OCC to organize Figure Bank.[9] The application states that Figure Bank would be engaged in the same lending activities that Figure Lending LLC currently engages in, as well as new payments activities to be launched by Figure Payments Corporation (both entities are currently subsidiaries of Figure Technologies Inc.).

145.    After the OCC formally approves the Figure Charter Application the agency has already vetted, Figure Lending LLC and Figure Payments Corporation will be merged into Figure Bank which, by virtue of the NBA's preemption of state laws administered by CSBS's members, will enable Figure to "offer a cohesive set of products and services to its customers nationwide, to focus its compliance efforts on the requirements of a single regulator."

146.    The Figure Charter Application makes clear, however, that Figure Bank "would not be an insured depository institution." Because Figure has applied for a national bank charter and would not, as a condition of obtaining this charter, obtain deposit insurance, as explained herein, the OCC lacks the legal authority to grant the charter it has actively solicited and is poised to grant.

---

[8] See Michelle Alt and Ashley Harris, *Deep Dive into Figure's Bank Charter Application*, Lendlt Fintech Digital at 17:10 (available at https://digital.lendit.com/talks/deep-dive-into-figures-bank-charter-application/).

[9] Although the Figure Charter Application was filed on November 6, 2020, the application was not posted on the OCC's website until November 11, 2020.

147.    Based on the information that is available, and the OCC's consistent position that a proposed national bank that would accept deposits must obtain deposit insurance from the FDIC, the only logical inference that can be drawn from the statement that Figure Bank would not be FDIC-insured is that Figure Bank would not, in OCC's view, be "engaged in the business of receiving deposits" within the meaning of the FDIA.

148.    However, in (at times conflicting) statements to the press, representatives from Figure have insisted that Figure has not applied for a Nonbank Charter because Figure will be engaged in deposit-taking. But the Nonbank Charter has always been an OCC charter issued to an institution to carry on the business of banking without being required to obtain FDIC insurance to do so. Since Figure intends to carry on the banking business without obtaining FDIC insurance, Figure has applied for a Nonbank Charter. This is the case regardless of whether Figure would not be FDIC-insured because OCC has "decided" they would not be eligible to be insured, or because OCC has "decided" they simply should not be required to be insured. Figure's assertions—and the OCC's behind-the-scenes guidance to the company—that it is not applying for the Nonbank Charter are merely a thinly veiled effort to avoid the controversy surrounding the Nonbank Charter and to evade the scope of the *Vullo* Ruling.

149.    Thus, regardless of whether Figure Bank would be a noninsured institution that does not engage in deposit-taking or that does engage in deposit-taking, Figure has applied for a charter that the OCC lacks the authority to grant.

150.    Just as with the establishment of the Nonbank Charter Program itself, the OCC's acceptance of the Figure Charter Application has triggered significant public objection and concern. For instance, a group of trade associations representing various segments of the banking industry sent a letter to the OCC expressing concern that approval of the Figure Charter

Application would be "precedent shattering" because, in ignoring the deposit insurance mandate Congress has placed on national banks, the OCC would "violate the Federal law, the consistently expressed intent of Congress, and public policy considerations essential to the functioning of the nation's financial system." *See* Joint letter of banking associations to OCC dated Dec. 7, 2020 (available at https://www.aba.com/advocacy/policy-analysis/joint-trades-letter-to-occ-re-figure-bank).

151.　Likewise, a coalition of consumer oriented-interest groups sent a letter to the OCC urging it to reject the Figure Charter Application because the OCC lacked the authority to charter a noninsured national bank and because Figure Bank was structured to "gain the benefits of preemption while evading state consumer protections and avoiding any obligation to meet the convenience and needs of the communities." *See* Consumer groups letter to OCC dated Dec. 8, 2020 (available at https://ncrc.org/ncrc-two-other-consumer-groups-send-comment-letter-opposing-figures-application-for-a-national-bank-charter/).

## THE NONBANK CHARTER PROGRAM CANNOT STAND, AND THE OCC LACKS AUTHORITY TO APPROVE THE FIGURE CHARTER APPLICATION

**I.　The OCC Lacks Statutory Authority to Charter Nondepository Institutions or Noninsured Depository Institutions and, Thus, the Nonbank Charter Program and Impending Chartering of Figure Bank, N.A., Are Unlawful.**

152.　The OCC's Nonbank Charter Program exceeds the OCC's statutory authority because it is not authorized by the NBA to charter an institution to carry on the business of banking that would not be eligible for, apply for, and obtain deposit insurance from the FDIC and, therefore, the OCC lacks the authority to approve the Figure Charter Application.

153.　To the extent that Figure has applied to organize an institution that would not, in the OCC's view, be eligible for deposit insurance because it would not, in OCC's view, receive deposits within the meaning of the FDIA (referred to herein as "nondepository institutions"), the

Case 1:20-cv-03187-DLF   Document 1   Filed 12/22/20   Page 42 of 70

OCC lacks the authority to approve the Figure Charter Application and any other such applications for Nonbank Charters because Figure Bank and any other recipient of a Nonbank Charter would not be lawfully entitled to commence the business of banking under the NBA.

154. Additionally, to the extent that Figure has applied to organize an institution that would, in the OCC's view, be engaged in receiving deposits within the meaning of the FDIA but, despite the OCC's repeated assertions to the contrary, would not be required to obtain deposit insurance (referred to in this Part as "noninsured depository institutions"), the OCC lacks the authority to approve the Figure Charter Application and any other such applications for Nonbank Charters because Figure Bank and any other recipient of a Nonbank Charter would not be lawfully entitled to commence the business of banking under the NBA.

**A.    The OCC Lacks Statutory Authority to Charter Nondepository Institutions and, Thus, to Establish the Nonbank Charter Program and Approve the Figure Charter Application.**

155. The OCC's Nonbank Charter Program exceeds the OCC's authority under the NBA. The OCC lacks the authority to make the determination that a proposed national bank need not obtain deposit insurance from the FDIC because, in OCC's view, they would not be "engaged in the business of receiving deposits" within the meaning of the FDIA. Accordingly, to the extent that Figure Bank would not obtain FDIC insurance because the OCC believes that Figure Bank would not be engaged in receiving deposits, the OCC lacks the authority to approve the Figure Charter Application.

156. Congress has never conferred upon the OCC the broad power to redefine the business of banking to exclude deposit taking. To do so would have enabled the OCC to create new categories of federal business charters for companies that are not organized to carry on, let alone lawfully entitled to commence, the business of banking. In fact, each time the OCC has

attempted to exceed its authority by issuing such charters, the federal courts have struck down its efforts.

157.    As previously noted, it is only upon specific authorization by Congress that the OCC has been allowed to issue special-purpose bank charters to institutions that do not, under existing law, lawfully carry on the business of banking. Applying fundamental principles of statutory construction, the existence of these specific grants of Congressional authority necessarily demonstrates that the OCC does not have any authority to charter special-purpose national banks other than those expressly authorized by statute. These specific statutory grants of special- purpose chartering authority would never have been necessary if the OCC possessed general authority to issue special-purpose charters. In addition, to adopt a broad view of the OCC's chartering authority would render the specific grants of statutory chartering authority for bankers' banks and trust banks redundant and mere surplusage, contrary to established canons of statutory construction.

158.    In asserting that it has the power to issue Nonbank Charters and approve the Figure Charter Application, the OCC relies upon an interpretation of the "business of banking" set out in one of its own regulations, 12 C.F.R. § 5.20(e)(1), which was recently held to be invalid and set aside. That regulation states that the OCC may charter a special-purpose bank that engages in any activity within the business of banking, provided that it conducts "one of the following three core banking functions: Receiving deposits; paying checks; or lending money" (emphasis added). But the OCC cannot expand the nature or scope of its own chartering authority—only Congress can do that.

Case 1:30-cv-03445-DLF   Document 1   Filed 13/03/50   Page 44 of 70

159.    Because Section 5.20(e)(1)—never before used by the OCC to support a chartering decision—would allow a bank charter to be issued to an organization that would not

take deposits and therefore would not carry on the business of banking, it is patently inconsistent with the NBA, BHCA, FDIA and FRA, as well as established court precedent and long-standing OCC interpretations. Indeed, the OCC has crafted Section 5.20(e)(1) so expansively that the agency could create an immeasurable variety of special-purpose nonbank charters under the purported reach of the regulation. There is no Congressional authority for this far-reaching power, and the interpretation set out in Section 5.20(e)(1) cannot serve as a valid basis for the OCC's Nonbank Charter Program or the approval of the Figure Charter Application.

160.    The OCC interprets Section 5.20(e)(1) in a manner unsupported by any statutory language or Congressional instruction. Through this interpretation, the OCC purports to have the power to define the scope of its own regulatory authority. As such, this interpretation is not entitled to any deference. Nor is the OCC entitled to deference where its decision making relates in part to the interpretation of banking statutes it is not charged with implementing and purports to reconcile conflicting statutory regimes.

**B.    The OCC Lacks Statutory Authority to Charter Noninsured Depository Institutions and, Thus, to Establish the Nonbank Charter Program and Approve the Figure Charter Application.**

161.    The OCC's Nonbank Charter Program exceeds the OCC's authority under the NBA because the OCC is not authorized to charter noninsured depository institutions. To the extent the OCC believes that Figure Bank would be engaged in receiving deposits and also intends to exempt Figure from its obligation to obtain deposit insurance from the FDIC, the OCC lacks the authority to approve the Figure Charter Application.

162.    For as long as we have had a system of federal deposit insurance in this country, national banks have always been required to obtain deposit insurance in order to be lawfully entitled to commence the business of banking. *See* 12 U.S.C. §§ 26, 222. And failure to become an FDIC-insured banks so has always been met with the penalty of charter forfeiture. 12 U.S.C. §

45

501a. Because of this insurance mandate for national banks, national banks are prohibited from terminating their status as an insured bank, again, subject to the loss of the rights, privileges and franchises conferred with a national bank charter. *See* 12 U.S.C. § 1818(a)(1)(A).

163.    When Congress has decided to authorize the OCC to charter institutions that would not be required to obtain deposit insurance, it has done so explicitly. For instance, in the case of national trust companies, the very nature of their business renders them ineligible. *See* 12 U.S.C. §§ 27(a), 92a.

164.    And Congress has previously considered, but declined to adopt, laws allowing national banks to be organized as noninsured "wholesale financial institutions"—that is, institutions that would only accept uninsured wholesale deposits (*i.e.* deposits in amounts in excess of the deposit insurance limit)—and, to accommodate their formation, creating a new exemption to the BHCA and the coinciding restrictions maintaining the separation of banking and commerce. *See e.g.*, Supplemental Report of the Committee on Banking and Financial Services House of Representatives on H.R. 10, Financial Services Competition Act of 1997, H. Rept. 105-164, Part 2 (Sept. 17, 1997).

165.    Just as if the OCC were permitted to charter nondepository institutions, the OCC's creation of a charter for noninsured depository institutions triggers severe ramifications that dismantle the structure of the American banking system deliberately constructed by Congress over the past 150 years.

166.    For instance, the separations put in place by Congress between banking and commerce will unravel as big technology and commercial enterprises are allowed to enter the banking system and access the unique privileges formerly reserved strictly to insured depository

institutions, including the federal safety net of the Federal Reserve discount window and payments systems.

167.    Additionally, recipients of Nonbank Charters, such as Figure, will evade coverage of the BHCA although they do not fall within any of the express exemptions enacted in CEBA. As a result, applications for Nonbank Charters, such as the Figure Charter Application, raise "substantial questions" under the BHCA. Therefore, the OCC must defer its decision on such applications to the Federal Reserve Board for its initial consideration of its legality under the BHCA. *See Whitney v. National Bank of New Orleans & Trust Co.*, 379 U.S. 411, 426 n.7 (1965). The *Whitney* substantial question doctrine is based on the premise that as long as a substantial BHCA issue is present an applicant for a national bank charter would not be "lawfully entitled to commence the business of banking" as required by the NBA. *See id.* at 425.

168.    In short, all the same policy concerns that arise in the case of an OCC-chartered nondepository institution—whether it is the scope of federal authority, preemption of state consumer protection, distortion of the marketplace, and the chilling of financial innovation—are equally present in the case of an OCC-chartered noninsured depository institution, and then some.

169.    Figure representatives have repeatedly asserted that Figure will only accept "uninsured deposits." But, under the FDIA, an "uninsured deposit" is the amount due to any depositor for deposits in an *insured depository institution* in excess of the deposit insurance limit.

Case 1:30-cv-0831-DFL — Document 1   Filed 73/05/00   Page 43 of 20

170.    The federal deposit insurance system was put in place not only to ensure that the savings of bank customers are not lost as a result of bank failure, but, perhaps more importantly, to protect the banking industry by restoring confidence therein in order to reduce the likelihood

of bank runs in the first place. *See, e.g.*, Federal Deposit Insurance Corporation, A Brief History of Deposit Insurance in the United States (1998).[10]

171.     Thus, allowing the OCC to charter a noninsured depository institution would be entirely inconsistent with the purposes of the FDIA, *see e.g.,* 12 U.S.C. § 1816(7), in addition to the overwhelming majority of federal banking laws that Congress has deliberately applied to insured depository institutions and which would not apply to a noninsured depository institution.

172.     Finally, the OCC's attempt to waive the deposit insurance requirement for national banks in order to establish the Nonbank Charter Program and approve the Figure Charter Application is not entitled to deference because, through this interpretation, the OCC purports to have the power to define the scope of its own regulatory authority. Nor is the OCC entitled to deference where its decision making relates in part to the interpretation of banking statutes it is not charged with implementing and creates conflict between otherwise reconciled statutory regimes.

## II.     The OCC's Actions in Implementing the Nonbank Charter Program and in Soliciting and Accepting of the Figure Charter Application are Arbitrary and Capricious.

173.     The OCC's Nonbank Charter Program also is arbitrary, capricious, and an abuse of discretion because it has neither considered the many significant implications of the Nonbank Charter Program, nor has it offered a reasoned explanation for its actions.

174.     Among other things, the OCC wholly failed to respond adequately to the many relevant and significant public comments received in response to its Nonbank Charter Program.

---

[10] *See A Brief History of Deposit Insurance in the United States*, Prepared for the International Conference on Deposit Insurance, September 1998 (available at https://www.fdic.gov/bank/historical/brief/brhist.pdf).

This includes the many significant policy considerations that weigh strongly against the creation of this new special charter.

175.     As articulated in CSBS's letters in response to the white paper and Manual Supplement, as well in the public feedback of many others, the Nonbank Charter Program has raised numerous concerns that remain unaddressed, including but not limited to:

- The nonbank charter is structured to evade the coverage of the BHCA, enables the commingling of banking and commerce, and results in the extension of the federal safety net to a wide range of large commercial enterprises.

- The special-purpose charter undermines and preempts existing state regulation of financial services providers; charter holders are entitled to preemption of some state laws, to the detriment of consumers.

- The charter will not create a level playing field between bank and nonbank financial institutions, but instead will result in the OCC distorting the marketplace generally by the OCC picking only a few, privileged financial institutions whose business models it favors and conferring on them an unprecedented competitive advantage over other market participants..

176.     The OCC failed to acknowledge, much less analyze and address, most of these myriad concerns before implementing the Nonbank Charter Program.

177.     Additionally, the OCC's actions are arbitrary and capricious to the extent that the OCC has or will imminently determine that Figure Bank would be engaged in receiving deposit within the meaning of the FDIA but is not required to obtain deposit insurance to lawfully commence the business of banking,

Case 1:20-cv-05786 Document 1 Filed 07/27/20 Page 49 of 70

178.     As detailed above, for the past four years, the OCC has repeated that an institution that engages in receiving deposits must obtain deposit insurance from the FDIC. Indeed, the OCC consistently maintained this position because it sought to argue that the clear and unambiguous deposit insurance requirement for national banks only applies if a national bank would be taking deposits.

49

179.     After a federal court found that the OCC lacked the authority to charter an institution that would not engage in receiving deposits, however, the OCC, in soliciting and accepting the Figure Charter Application, has apparently adopted the entirely contradictory, yet equally meritless, position that a national bank is not required to obtain deposit insurance, even if it would be engaged in receiving deposits. This is the very definition of capricious action and cannot be a valid legal basis for the approval of the Figure Charter Application.

180.     As before, the OCC has failed to respond adequately to, or address, the significant public concerns raised in response to the Figure Charter Application, including the many significant legal and policy considerations that weigh strongly against creating a new type of national bank charter that is exempt from the requirement to obtain deposit insurance.

III.     **The Nonbank Charter Program and the Figure Charter Application Harm CSBS's Member Regulators and CSBS Itself.**

181.     The Nonbank Charter Program, including the solicitation and acceptance of the Figure Charter Application, has created regulatory interference with traditional areas of state concern; namely, the enforcement of state laws, including consumer protections such as state usury laws and state licensing laws applicable to nondepository financial institutions providing consumer financial services. These state laws are of vital importance to the states and their economies, communities, and citizens, and reflect the unique policy priorities and commitments of the residents of each state.

182.     As outlined above, the NBA and the OCC's implementing regulations assert preemption of state consumer financial laws, including, among others, state licensing laws and state usury laws. The OCC's Policy Statement, Licensing Manual Supplement and related public issuances repeatedly state that recipients of a Nonbank Charter are subject to the same laws and

regulations that apply to national banks, including the federal laws affording preemption and rendering state consumer financial laws inapplicable.

183. In announcing its final decision to establish the Nonbank Charter Program, the OCC made clear that the Nonbank Charter is an option that would vitiate the necessity of pursuing state licensure. Further, as indicated in the OCC's subsequent statements, the primary motivation for a nondepository financial institution to seek the Charter is to avoid compliance with existing state law. The preemptive effect of the Nonbank Charter Program occurs regardless of the nature, size or location of the charter holder's business.

184. Thus, the scope of the harm to CSBS's members is significant. The Nonbank Charter Program is available to a very broad array of financial services providers—ranging from start-up ventures to well-established conglomerates—providing a wide variety of services, from the traditional (e.g., payment processing) to the more cutting edge (*e.g.*, marketplace lending and distributed ledger technology). Regardless of the label applied to the charter, interference with state regulatory authority is inevitable for at least three reasons: (1) an institution must engage in lending or transmitting money to be eligible for the Nonbank Charter; (2) all states license and regulate the activities of lending and transmitting money; and (3) the OCC has asserted that the application of state regulatory authority to Nonbank Charter holders is preempted.

185. Figure is currently licensed and regulated by state regulators as a mortgage lender, consumer lender, and/or debt collector in 49 states and the District of Columbia.

Case 1:30-cv-05383-DPE   Document 1   Filed 13\SS\36   Page 51 of 16

186. By way of just one example, Figure currently holds a mortgage company license in the State of New Mexico and is subject to New Mexico laws governing the activities of mortgage loan companies, including the New Mexico Mortgage Loan Company Act, N.M. Stat.

Ann. § 58-21-1 *et seq*.; the New Mexico Home Loan Protection Act, N.M. Stat. Ann. § 58-21A-1 *et. seq*.; and the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1 *et seq*..

187.    These fair lending and anti-predatory lending laws in New Mexico currently require Figure to, among other things, demonstrate that its mortgage loans provide reasonable, tangible net benefits to borrowers residing in New Mexico.  These laws also restrict Figure from, among other things, imposing certain loan terms such as prepayment penalties and balloon payment terms while, more generally, preventing unfair or deceptive practices or discriminatory practices in lending. New Mexico also imposes other limitations on mortgage lending, such as restrictions on loan flipping, negative amortization, abnormal prepayment penalties, and loan packing practices, e.g., N.M. Stat. Ann. §§ 58-21A-1 *et seq*.

188.    All of these requirements, restrictions and prohibitions are policed, in the first instance, by requiring Figure to obtain licensure from and submit to regular examination by the New Mexico Division of Financial Institutions for compliance with these laws.

189.    The Nonbank Charter Program and Figure's impending charter directly impede enforcement of numerous other state laws as well. This includes, for example, restrictions on consumer lending, such as mandating consideration of a borrower's ability to repay, *e.g.*, Mo. Rev. Stat. § 367.185(4); and the imposition of requirements on money transmitters to preserve customer funds from misappropriation, data breaches and insolvency, *e.g.*, Cal. Fin. Code §§ 2037, 2081. Compliance with these requirements is ensured through regular examination by the appropriate state regulatory agency, and violation of these prohibitions and restrictions triggers several possible government actions, from investigation and inspection to enforcement actions and criminal referral. *See, e.g.*, Wash. Rev. Code Ann. §§ 19.146.100, 110, 220.

Case 1:35-cv-03183-DLF   Document 1   Filed 7/03/35   Page 25 of 10

190.     By way of another example, fifteen states in which Figure holds a license effectively ban high-cost, short-term small-dollar lending, often referred to as "payday lending," by setting interest rate caps or usury limits at levels at which this type of lending would not be profitable. *See, e.g*., Ark. Const. amend. 89, § 3. However, the OCC has asserted that recipients of the nonbank charter are permitted under the NBA to "export" the interest rates permitted in one state into another state, as explained above. Thus, according to the OCC, Figure (and any other nonbank) would be, for the first time, permitted to override these state laws and engage in what would otherwise be usurious lending under state law.

191.     If the OCC is allowed to preempt state law, Figure will circumvent each of these described state laws and more. This includes, the State of New Mexico's prohibition on predatory, discriminatory and unfair lending practices described above, thus depriving New Mexico's citizens of multiple protections and robbing New Mexico itself of the ability to control this important policy issue. And, just as in New Mexico, the laws of all of the other states that impose licensing requirements on Figure, regulate the terms of credit it offers, and impose limitations on disbursements, repayments, fees and charges, or rates of interest on loans offered by Figure would no longer apply by virtue of NBA preemption. *See* 12 C.F.R. 7.4008(d), 34.4(a). Even where a state law is not preempted by the NBA, the authority of state regulators to enforce such non-preempted laws will itself be preempted with respect to Figure and other Nonbank Charter recipients due to the OCC's exclusive visitorial authority over national banks. *See* 12 C.F.R. 7.4000.

192.     The Nonbank Charter Program and the purported applicability of federal preemption to Nonbank Charter recipients therefore undermines the states' enforcement of their own laws. The OCC's actions impede the states' ability to continue their existing regulation of

financial services companies within their borders and to enforce state laws designed to protect the consuming public and ensure the safety and soundness of nondepository companies. This injury to state enforcement creates a judicially cognizable interest because it impedes the states' exercise of their sovereign power to create and enforce a legal code and diminishes that sovereignty.

193.     The OCC's actions also create difficulties for the states in detecting unlicensed activity within their borders. Similarly, companies facing or at risk of state enforcement actions escape state enforcement authority by obtaining a Nonbank Charter. Indeed, the OCC has a history of quickly approving charter applications for entities seeking to avoid state enforcement, interfering significantly with ongoing state supervisory and enforcement actions.[11]

194.     Indeed, even before the OCC accepted the Figure application, interference with the regulatory operations of CSBS's members had already materialized in several forms. For instance, since the OCC has begun its campaign to redefine what it means to be a bank under federal law, confusion has arisen as to the meaning of "banking" under state regulatory and criminal laws prohibiting persons from referring to themselves as, or implying that they are, "banks" without a bank charter.

195.     Additionally, because of the OCC's ongoing effort to expand its chartering authority to noninsured national banks, states must review their licensing laws to ensure that the exemptions traditionally afforded insured banks are appropriately calibrated and adjusted.

---

[11] *See, e.g.*, Ryan Tracy, *Switching U.S. Regulators Upends Probe Into Japan's Biggest Bank*, The Wall Street Journal, November 15, 2017 (available at https://www.wsj.com/articles/japanese-bank-switches-u-s-regulators-in-middle-of-investigation-1510741802).

196.     The establishment of the Nonbank Charter Program also poses challenges for CSBS's members in allocating resources for examination and enforcement as state regulators are faced with the very real prospect that significant resources may be devoted to such efforts, only to have the relevant institution seek to escape their jurisdiction by obtaining a Nonbank Charter from the OCC.

197.     The OCC's actions also impede cooperation between the states, which further burdens state resources. State laws require that state-licensed mortgage companies like Figure be regularly examined (generally on annual basis), and in the case of companies licensed in multiple states, state regulators work to coordinate exams to make efficient use of state resources. Figure has more than 40 state mortgage lending licenses. For the states to fulfill their statutory exam mandates for a company with this many licenses requires the commitment and coordination of resources across multiple states. Figure's unexpected ability (and the ability of other nonbanks like it) to avoid this oversight via the Nonbank Charter creates uncertainty for state agencies seeking to effectively coordinate and allocate important exam resources.

198.     The OCC's actions will also injure CSBS's members in a directly quantifiable way. Pursuant to state law, the operating expenses of state licensing and supervision are funded by assessments levied by state regulators upon licensed financial institutions. *See e.g.*, N.C. Gen. Stat. § 53-244.100A ("For the purpose of meeting the cost of regulation under this Article, each mortgage lender, mortgage broker, and mortgage servicer licensed under this Article shall pay into the OCOB an assessment as provided in this subsection."); Georgia Code, O.C.G.A. § 7-1-41(a) ("The department may, by regulation, prescribe annual examination fees, license fees, registration fees, and supervision fees to be paid by the institutions and entities assigned to the department by this title for regulation, supervision, licensure, or registration."); Montana

55

Mortgage Act § 32-9-117 (imposing fees on mortgage licensees to fund Montana's supervisory program for mortgage licensees).

199.    The negative fiscal implications of the Nonbank Charter Program for CSBS's members are thus immediately obvious. Every non-depository financial firm that receives a Nonbank Charter in place of a state license to operate in a state deprives CSBS's members of crucial resources that are necessary to fund the regulatory functions of CSBS's members. Regardless of intent, the OCC's actions pose an insidious threat to the health of each state's regulatory environment, which is designed to protect the markets and consumers within each state.

200.    Finally, CSBS itself is harmed by the Nonbank Charter Program and the OCC's acceptance and imminent approval of the Figure Charter Application in multiple significant ways.

201.    First, the Nonbank Charter Program interferes with CSBS's ability to facilitate coordinated multi-state oversight. CSBS facilitates state financial regulators' work developing common standards and approaches to licensing and supervision. CSBS also coordinates exam scheduling and planning for institutions, like Figure, that operate in multiple states. This work involves CSBS staff and resources across the organization's legal, regulatory, and data collection and analytics functions.

202.    Allowing nonbanks to evade state regulation through the Nonbank Charter Program interferes with CSBS's ability to effectively facilitate examination planning and coordination processes, leading to inefficiencies and waste in the use of personnel and resources by both CSBS and the states in multi-state examination and enforcement settings.

Case 1:25-cv-03383-DFB    Document 1    Filed 15/25/25    Page 56 of 70

203.     Second, the Nonbank Charter Program interferes with CSBS's ability to efficiently administer technology tools and platforms, including the NMLS, on behalf of the states.

204.     NMLS is a nationwide licensing platform that serves as the system of record for state licensure of nonbank money transmitters, consumer lenders, and other licensed nonbank financial institutions. CSBS also maintains a state supervisory technology platform – the State Exam System ("SES") – through which a majority of states conduct a wide range of examinations of state-licensed nonbank financial services companies.

205.     Maintaining and developing technology platforms on behalf of the states costs CSBS millions of dollars per year. This work is planned months, sometimes years, in advance, with budgetary and staffing decisions based on expectations regarding the level of state licensing and supervisory activity.

206.     By enabling state-regulated nonbanks, such as Figure, to escape state licensing and regulation, the Nonbank Charter Program interferes with CSBS's ability to reliably anticipate future staffing and resource needs and creates real risks of over- or under-staffing and misallocation of resources.

**THE OCC'S REGULATIONS PREEMPTING STATE LAW ARE INVALID,
REGARDLESS OF WHETHER THE OCC HAS
THE AUTHORITY TO CREATE THE NONBANK CHARTER**

I.     **The OCC's Regulations Purporting to Preempt State Law—A Central Feature of
the Nonbank Charter Program—Are Invalid and Must be Set Aside.**

207.     The primary purpose of the Nonbank Charter Program is to enable state-regulated nonbanks to avail themselves of federal preemption afforded under the NBA in order to escape state regulation. For instance, the Nonbank Charter Program will purportedly allow recipients of the Nonbank Charter to avoid state licensing and regulation and, instead, comply with a single

57

set of rules and submit only to a single regulator, the OCC. In offering this purported benefit, the OCC relies on its own broad regulations, which declare that a wide variety of state consumer financial laws are inapplicable to national banks as a result of federal preemption under the NBA. *See* 12 C.F.R. §§ 7.4007, 7.4008; 34.4 (the "Preemption Regulations").

208.     But because these Preemption Regulations have been adopted and maintained without observance of procedure required by law and exceed the limitations on OCC's regulatory authority imposed by the Dodd-Frank Act, they are invalid.

209.     In 2010, Congress enacted the Dodd-Frank Act and amended the NBA by adding a provision addressing how and when the NBA preempts state law and generally limiting NBA preemption. *See* 12 U.S.C. § 25b. A primary purpose of these newly imposed limitations on the OCC's authority was to reverse OCC's broad and anticipatory assertions of federal preemption, which previously had "created an environment where abusive mortgage lending could flourish without State controls" in an effort "to attract additional charters." S. Rep. No. 111-176, at 16-17 (2010).

210.     Section 25b provides that "[s]tate consumer financial laws are preempted, *only if* . . . . in accordance with the legal standard for preemption in the decision of the Supreme Court of the *United States in Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al.*, 517 U.S. 25 (1996), the State consumer financial law *prevents or significantly interferes with* the exercise by the national bank of its powers." 12 U.S.C. § 25b(b)(1)(B) (emphasis added).

Case 1:50-cv-00000-BLF   Document 1   Filed 05/03/50   Page 28 of 70

211.     Section 25b further provides that any determination made by the OCC that state consumer financial laws are preempted under this standard must be made "by regulation or order . . . on a case-by-case basis." *Id.*

212.    Section 25b also requires the OCC every five years to review and decide, through notice and comment, whether to "continue or rescind" each OCC regulation or order which asserts that state consumer financial laws are preempted. *See* 12 U.S.C. § 25b(d)(1).

213.    To implement Section 25b, in 2011, the OCC revised some of the language of its Preemption Regulations to reference the *Barnett Bank* decision itself, but did not incorporate the "prevent or significantly interfere" preemption standard in its Preemption Regulations. *See* 76 Fed. Reg. 43549 (July 21, 2011). Notwithstanding the lip service to the *Barnett Bank* decision, however, the OCC's revised Preemption Regulations do not comply with the substantive and procedural requirements in Section 25b, and are therefore invalid, for three reasons.

214.    First, the OCC Preemption Regulations do not comply with the *Barnett Bank* "prevent or significantly interfere" preemption standard but, instead, continue to follow an outdated preemption standard that deems state law preempted by the NBA if the state law "obstructed, impaired, or conditioned" the exercise of national bank powers. *See Clark v. Bank of Am., N.A.*, 2020 U.S. Dist. LEXIS 31454, at *11 (D. Md. Feb. 24, 2020) ("[d]espite the drastic changes enacted in Dodd-Frank, the OCC has made little revision to its position on preemption of state consumer protection laws").

215.    Although Congress intended to eliminate this latter standard through Section 25b, the OCC has largely retained it by falsely claiming that its preemption regulations were always based on the *Barnett Bank* standard—a claim that has not withstood judicial scrutiny. *See Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1193-94 (9th Cir. 2018) (". . . to the extent that the OCC has largely reaffirmed its previous preemption conclusions without further analysis under the *Barnett Bank* standard, *see* 76 Fed. Reg. at 43556, we give it no greater deference than before

Dodd-Frank's enactment, as the standard applied at that time did not conform to *Barnett Bank*. That is, the OCC's conclusions are entitled to little, if any, deference.")

216.    In part, because the Preemption Regulations have failed to appropriately apply and incorporate the *Barnett Bank* preemption standard, the regulations have continued to provide field preemption, which is directly contrary to Section 25b. *See* 12 U.S.C. § 25b(b)(4). *Compare* 12 U.S.C. § 25b(b)(1)(B) (providing that state law is not applicable only if the OCC determines that state law is preempted) *with* 12 C.F.R. §§ 7.4007(c) (providing that state law is not applicable unless the OCC determines that state law is not preempted).

217.    Second, the Preemption Regulations were enacted and, and continue to be maintained and applied, without a case-by-case determination of whether the state consumer financial laws they purportedly preempt impermissibly interfere with national bank powers. Instead, the Preemption Regulations assert, in a sweeping and anticipatory fashion, that broad categories of state law are preempted. *See* 12 CFR §§ 7.4007(b), 74008(d), 34.4(a). *See also* 12 U.S.C. § 25b(b)(3)(A) (defining "case-by-case basis").

218.    Courts have already noted that the OCC has improperly determined that "it was not bound by Congress's mandate to review state consumer protection laws on a 'case-by-case' basis." *Clark* at *11; *see also Lusnak* at 1193 (9th Cir. 2018) ("The OCC did not conduct its own review of specific potential conflicts on the ground."); *Hymes v. Bank of Am., N.A.*, 408 F. Supp. 3d 171, 180 (E.D.N.Y. 2019) ("...the OCC believed it was not bound by Dodd-Frank's case-by-case requirement to justify its decision with respect to each category of state law on the list.").

219.    The OCC has recently confirmed, and cannot dispute, that the case-by-case requirement "applies to OCC preemption determinations pursuant to section 25b(b)(1)(B)." *See* OCC Interpretive Letter 1173 at p. 3 (December 18, 2020) (available at https://occ.gov/news-

issuances/news-releases/2020/nr-occ-2020-176a.pdf). In revising its Preemption Regulations, OCC acknowledged that it was determining that broad categories of state laws are preempted pursuant to the authority set out in section 25b(b)(1)(B). 76 Fed. Reg. at 43556-7. Therefore, even the OCC must concede that the Preemption Regulations violate the procedural requirements of Section 25b because the OCC did not comply with the case-by-case requirement of Section 25b(b)(1)(B) in revising those regulations.

220.    Third, regardless of whether OCC's revised Preemption Regulations complied with Section 25b's procedural and substantive requirements at the time they were adopted, the OCC has failed to conduct a periodic review of these regulation, as is required by Section 25b(d) and, thus, the regulations are no longer valid.

221.    Section 25b(d) requires the OCC every five years to conduct a periodic review of every OCC regulation preempting state consumer financial law by reproposing those regulations, providing an opportunity for public notice and comment, and deciding whether to continue or rescind those regulations.

222.    When the OCC revised its Preemption Regulations in 2011, it reviewed the existing list of categories of state laws that it contends are preempted to confirm that the types of state laws listed were "state consumer financial laws" that "present a significant interference, within the meaning of *Barnett*, with the exercise of [] national bank powers." 76 Fed. Reg. at 43557. Since repromulgating the list of preempted categories of state law at that time, the OCC has never revisited the Preemption Regulations, as is required by Section 25b(d).

223.    Yet the OCC has recently confirmed that regulations determining that state consumer financial laws are preempted under Section 25b(b)(1)(B) are subject to the 5-year periodic review requirement. *See* OCC Interpretive Letter 1173, at p. 4. Inexplicably, the

Preemption Regulations were adopted in 2011 and have not been reproposed since that time—thus, those regulations are invalid and must be set aside.

224.     The OCC Preemption Regulations effectuate the primary purpose for which the Nonbank Charter Program was created—that is, to preempt state law and enable charter recipients to operate nationwide under a single set of uniform standards. Because these regulations fail to comply with substantive and procedural limitations Congress has placed on NBA preemption, they must be deemed invalid.

## CLAIMS FOR RELIEF

## COUNT I

### Action Exceeding Statutory Authority:
### Nonbank Charter Program and Approval of the Figure Charter Application

225.     CSBS incorporates by reference the allegations of the preceding paragraphs.

226.     The NBA only allows the OCC to charter entities to (1) carry on the "business of banking" or (2) carry on a special purpose expressly authorized by Congress.

227.     It is well settled by court precedent, federal banking laws, and historical chartering practice that to lawfully commence the "business of banking" under the NBA, a national bank must, at a minimum, engage in receiving deposits and apply for and obtain federal deposit insurance.

228.     The Nonbank Charter Program was improperly created to charter institutions that

would not lawfully carry on the "business of banking" under the NBA because the charter recipient will not engage in deposit-taking or obtain deposit insurance from the FDIC.

229.     The OCC lacks the authority to charter institutions not engaged in the "business of banking" without the express authorization of Congress. The OCC's own recently invalidated

62

regulation (12 C.F.R. 5.20(e)(1)) is insufficient to expand the scope of the OCC's chartering authority beyond that delegated to the OCC by statute.

230.    The OCC is currently subject to, and bound by, a nationwide federal court order (the *Vullo* Ruling) that sets aside 12 C.F.R. 5.20(e)(1) and prohibits the OCC from granting a national bank charter to an institution unless it would be engaged in deposit-taking. The OCC is estopped from challenging that binding order in the litigation of this matter.

231.    Additionally, pursuant to 12 U.S.C. § 222, national banks must be insured by the FDIC.

232.    The OCC is therefore exceeding its chartering authority by administering the Nonbank Charter Program and by accepting and imminently approving Figure's application for a Nonbank Charter thereunder because the OCC intends to grant a charter to Figure without obligating Figure to be eligible for, apply for, and obtain deposit insurance from the FDIC.

233.    The OCC's interpretation of the scope of its own authority is not entitled to deference, particularly where the OCC is attempting to interpret a number of federal statutes, including statutes the OCC is not charged with implementing.

234.    CSBS is entitled to review of the OCC's actions and relief pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 702 and 706(2)(A) and (C).

235.    The OCC's Nonbank Charter Program and its imminent approval of the Figure Charter Application exceed the OCC's statutory authority and are otherwise not in accordance with law.

236.    This Court should declare the Nonbank Charter Program unlawful and set it aside. This Court should also enjoin the OCC from taking further action toward the approval of the

Figure Charter Application, or to any other proposed national bank that would not be a federally insured depository institution.

## COUNT II

### Action Exceeding Statutory Authority:
### Promulgation of 12 C.F.R. § 5.20(e)(1)

237. CSBS incorporates by reference the allegations of the preceding paragraphs.

238. As previously noted, the NBA only allows the OCC to charter entities (1) to carry on the "business of banking" or (2) to carry on a special purpose expressly authorized by Congress.

239. In promulgating 12 C.F.R. § 5.20(e)(1), the OCC endeavored to unilaterally extend its authority to offer national charters to entities that do not currently and would not, under the charter, lawfully carry on the "business of banking," without the requisite Congressional authorization. The OCC cannot through the promulgation of regulations expand the scope of its own chartering authority beyond that delegated to the OCC by statute.

240. The OCC is currently subject to, and bound by, a federal court order (the *Vullo* Ruling) that sets aside 12 C.F.R. 5.20(e)(1) and prohibits the OCC from granting a national bank charter to an institution unless it would be engaged in deposit-taking. The OCC is estopped from challenging that binding order in the litigation of this matter.

241. Additionally, pursuant to 12 U.S.C. § 222, national banks must be insured by the FDIC.

242. The OCC is therefore precluded from relying upon 12 C.F.R. 5.20(e)(1) to accept or approve any Nonbank Charter application pursuant to which, contrary to federal law, the chartered institution would not apply for and obtain deposit insurance from the FDIC, including but not limited to the Figure Charter Application.

243. Moreover, the OCC's interpretation of the scope of its own authority is not entitled to deference, particularly where the OCC is attempting to interpret a number of federal statutes, including statutes the OCC is not charged with implementing.

244. CSBS is entitled to relief pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 702 and 706(2)(A) and (C).

245. Because Section 5.20(e)(1) has already been found by a federal court to improperly exceed the OCC's statutory authority, and because the OCC currently is estopped from arguing otherwise in this matter, this Court should recognize that this regulation is unlawful and has been set aside, as well as enjoin the OCC from taking further action toward the creation or issuance of any charter pursuant to this invalid regulation, including but not limited to the Figure Charter.

## COUNT III

### Arbitrary and Capricious Action:
### Nonbank Charter Program and Granting of Figure Charter

246. CSBS incorporates by reference the allegations of the preceding paragraphs.

247. In making and implementing the Nonbank Charter Program, as well as accepting the Figure Charter Application, the OCC not only acted beyond its statutory authority but also failed to consider the effect of its actions on the states' authority to regulate traditional areas of state concern.

248. The OCC likewise has acted directly contrary to its repeated public concessions that a chartered institution that engages in deposit taking must apply for and obtain FDIC insurance.

249. Further, the OCC has failed to consider the many significant concerns arising from the Nonbank Charter Program and the Figure Charter Application and it did not offer a reasoned explanation for its decision.

250. Under the APA, an agency cannot act in a manner that is arbitrary or capricious and is required to engage in "reasoned decision making" when adopting new rules. 5 U.S.C. § 706(2)(A).

251. Moreover, the OCC's actions are not entitled to deference, particularly where the OCC is attempting to define the scope of its own authority and interpret a number of federal statutes, including statutes the OCC is not charged with implementing.

252. The OCC's Nonbank Charter Program is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Thus, this Court must declare the Nonbank Charter Program unlawful and set it aside and enjoin the OCC from taking further action on the Figure Charter Application.

## COUNT IV

### Action Exceeding Statutory Authority:
### Promulgation and Application of Preemption Regulations

253. CSBS incorporates by reference the allegations of the preceding paragraphs.

254. A primary purpose of the Nonbank Charter Program is to enable state-regulated nonbanks to avail themselves of the federal preemption afforded under the NBA in order to escape state regulation.

Case 1:20-cv-03181-DLF   Document 1   Filed 12/22/20   Page 66 of 70

255. The Preemption Regulations upon which the OCC relies to extend federal preemption to national banks exceed the OCC's regulatory authority, however, and are therefore invalid. *See* 12 C.F.R. §§ 7.4007, 7.4008, and 34.4.

256. The Dodd-Frank Act amended the NBA to impose substantive and procedural limitations on the OCC's authority to issue regulations declaring that state law is not applicable to national banks because it is preempted by the NBA. 12 U.S.C. §25b.

257. Specifically, Dodd-Frank updated Section 25b to limit preemption to circumstances in which a state consumer financial law "prevents or significantly interferes with" the exercise of a national bank's powers.

258. Nonetheless, the revised Preemption Regulations thereafter promulgated by the OCC continue to apply an outdated and more broad standard that Congress rendered obsolete with the passage of Dodd-Frank, permitting the OCC to impose preemption whenever the OCC deems a state law to "obstruct, impair or condition" the exercise of national bank powers.

259. Additionally, the Preemption Regulations impose field preemption of state consumer financial laws, in direct contravention of Section 25b. The Preemption Regulations improperly impose a default presumption that a state consumer protection law is preempted, rather than imposing preemption only after a state law is determined to significantly interfere with national bank powers.

260. Section 25b further obligates the OCC to make a preemption determination on a "case-by-case basis."

261. Yet in promulgating and applying the Preemption Regulations, the OCC has not undertaken the required case-by-case analysis of the affected state laws. For each of these reasons, the OCC has exceeded its statutory authority in promulgating and applying the Preemption Regulations, which are therefore invalid.

262. CSBS is entitled to relief pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 702 and 706(2)(A) and (C). Because the OCC has exceeded its statutory authority by

Case 1:30-cv-03183-DLF Document 1 Filed 13/31/30 Page 61 of 10

promulgating and applying the Preemption Regulations, this Court must declare the Preemption Regulations unlawful and set them aside.

**COUNT V**

**Failure to Observe Procedure Required by Law:**
**Failure to Periodically Review Preemption Regulations**

263.    CSBS incorporates by reference the allegations of the preceding paragraphs.

264.    A primary purpose of the Nonbank Charter Program is to enable state-regulated nonbanks to avail themselves of the federal preemption afforded under the NBA in order to escape state regulation.

265.    The OCC relies upon its Preemption Regulations to extend federal preemption to national banks. *See* 12 C.F.R. §§ 7.4007, 7.4008, and 34.4(a)(1).

266.    Since their revision in 2011, the OCC has failed to conduct a periodic review of the Preemption Regulations every five years, as required by 12 U.S.C. § 25b(d), and the regulations are therefore no longer valid.

267.    CSBS is entitled to relief pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 702 and 706(2)(D). Because the OCC has failed to observe the procedures required by law, this Court must declare the Preemption Regulations unlawful and set them aside.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff CSBS prays for a judgment and order:

1.    Declaring that the Office of Comptroller of the Currency lacks statutory authority under the National Bank Act to create the Nonbank Charter Program and approve applications to charter institutions that would not lawfully carry on the "business of banking" because they would not engage in receiving deposits or obtain deposit insurance from the FDIC;

68

2. Declaring that the OCC lacked statutory authority under the National Bank Act to promulgate 12 C.F.R. § 5.20(e)(1);

3. Declaring that that OCC lacks statutory authority to approve the Figure Charter Application;

4. Declaring that the OCC's Nonbank Charter Program and the OCC's solicitation, acceptance, and approval of the Figure Charter Application are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

5. Declaring the Nonbank Charter Program unlawful and setting it aside;

7. Declaring the OCC's promulgation of 12 C.F.R. § 5.20(e)(1) unlawful and setting that regulation aside;

8. Declaring that the OCC lacked statutory authority to promulgate and apply the Preemption Regulations in contravention of 12. U.S.C. § 25b;

9. Declaring that the OCC's failure to periodically review the Preemption Regulations every five years has rendered the regulations invalid;

10. Declaring the Preemption Regulations unlawful and setting them aside;

11. Awarding injunctive relief prohibiting the OCC from continuing the Nonbank Charter Program or creating or issuing any Nonbank Charter pursuant to 12 C.F.R. § 5.20(e)(1);

12. Awarding injunctive relief prohibiting the OCC from granting a national bank charter to Figure or any other institution that seeks to carry on the business of banking under the NBA without obtaining FDIC insurance;

Case 1:25-cv-05817-DLC   Document 1   Filed 07/15/25   Page 69 of 70

13. Awarding Plaintiff its reasonable costs, including attorneys' fees, incurred in bringing this action; and

14. Awarding any such other relief as the Court deems just and equitable.

Date:  December 22, 2020

Respectfully submitted,

/s/ Jennifer Ancona Semko
Jennifer Ancona Semko (Bar No. 481119)
Graham Cronogue (Bar. No. 1044036)
BAKER & McKENZIE LLP
815 Connecticut Avenue NW
Washington, DC 20006
Tel: +1 202 835-4250
Fax: +1 202 416-7055
jennifer.semko@bakermckenzie.com
graham.cronogue@bakermckenzie.com

and

John Gorman
Margaret Liu
Michael Townsley
CONFERENCE OF STATE BANK
SUPERVISORS, INC.
1129 20th Street, NW
Washington, DC 20036
Tel: +1 202 296-2840
bgorman@csbs.org
mliu@csbs.org
mtownsley@csbs.org